## BARDE STEEL PRODUCTS CORPORATION v. COMMISSIONER OF INTERNAL REVENUE.
### No. 82.

Circuit Court of Appeals, Second Circuit.
April 7, 1930.

W. W. Spaulding, of Washington, D. C., and Roscoe C. Nelson, of Portland, Or. (Mason, Spalding & McAtee, of Washington, D. C., and Dey, Hampson & Nelson, of Portland, Or., of counsel), for petitioner.

J. Louis Monarch, Millar E. McGilchrist, John Vaughan Groner, and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, all of Washington, D. C. (R. N. Shaw, Sp. Atty., Bureau of Internal Revenue, of Washington, D. C., of counsel), for respondent.

Before L. HAND, SWAN, and MACK, Circuit Judges.

MACK, Circuit Judge.

On January 9, 1920, petitioner, an Oregon corporation, entered into a contract with the United States Shipping Board Emergency Fleet Corporation for the purchase of surplus steel which the latter had on hand or under order as a result of the curtailment of the war shipbuilding program. Since the present dispute turns mainly upon whether title to certain lots of this steel passed to the buyer and whether the latter became liable for the price during the taxable year, it is necessary to summarize the contract in considerable detail. It provided for the sale of excess steel on hand at designated points in the United States and Canada, other excess steel then owned by the Fleet Corporation and situated at unnamed points, and some that was to be delivered to it under existing contracts with third parties. At the date of the contract, the quantities, shapes, sizes, and state of fabrication of steel which would remain after the Fleet Corporation had completed its shipbuilding were not known, but the Fleet Corporation was required to ascertain, within a reasonable time and before January 9, 1921, the quantity of excess steel, and to certify its approximate amount, location, quality, size, and general specifications. The Fleet Corporation was made the sole judge as to what was to constitute excess steel under the terms of the contract. It was expressly provided that it would not guarantee the accuracy of the information contained in its certification; it undertook to sell only so much of the steel certified as it might deliver at the time petitioner requested delivery. The Fleet Corporation further reserved the right, even after a particular lot of steel had been certified, to except therefrom and to refuse delivery of steel which before November 20, 1919, it had agreed to sell to third parties, fabricated steel for building construction, scrap steel, steel required for the completion of hulls then or to be contracted for, fabricated steel which it desired to sell as units, and steel which the Corporation desired to return to third parties in the adjustment of contracts with them. This reserved right, however, terminated as to any goods resold by petitioners after such certification.

Petitioner agreed to accept and pay for the steel delivered to it by the Corporation at specified prices, f. o. b. cars, except as to certain lots located at Pennsylvania yards. As to these, petitioner was to pay and assume the cost of loading and certain storage charges. Payment was to be made on the basis of railroad scale weights. It was further specifically provided that "all such excess steel, including [that in the Pennsylvania yards] shall remain the property of the Seller until delivered to the Buyer as hereinafter mentioned. It is agreed that, for the purpose of this contract, delivery of said steel shall not occur until the same has been

certified, checked and actually loaded onto cars." The contract also provided for the supervision and checking by petitioner of all shipments. It was to examine the steel and (with certain immaterial exceptions) within one year after certification to give loading directions when and as it desired delivery of any particular portion of the certified lots. Within that period, the Fleet Corporation had no right to tender delivery to petitioner except upon receipt of such loading directions. Within five days after receipt of loading orders, the Fleet Corporation was to inspect and to verify its own certification figures and to begin loading; if it failed so to do within the prescribed period, petitioner was privileged (unless the delay was due to strikes, fire, riots, acts of God, or the public enemy) to load the steel as specified in its loading directions and to deduct the cost thereof from the amount due.

After delivery, which, as stated, necessitated both checking and loading of certified steel, the shipments were to be invoiced to petitioner, which was to pay for them on the 1st or 15th of the month. To insure payment, petitioner was required to and did pay to the Fleet Corporation the sum of $400,000, called a "guaranty fund," which was retained as security for the performance of the contract, and likewise posted a bond in the sum of $500,000 for the same purpose.

In actual practice, the contract was carried out by the Fleet Corporation sending to petitioner a certification consisting of a list of steel, giving quantity, size, description, and location; and, upon receipt of this certificate, which contained sufficient information for exact cost computation, petitioner set up the shipment on its own books as a liability, advertised the lot as its own steel available for immediate delivery, and sent a representative to the yard, who took charge of the shipment, checked it, cared for it, arranged for forwarding, and made any possible yard sales.

Petitioner, however, did not always accept the steel which was certified to it by the Fleet Corporation. Disputes arose between the parties from time to time during the contract period. Part of such differences developed by reason of petitioner acting as intermediary between the Shipping Board and the owners of the yard in which the steel was stored. Other differences were as to classification and assortment of steel. Petitioner's principal cause of complaint, however, was the failure of the materials manager for the Shipping Board to give certifi-

cation. This was a special cause of concern because of the falling market. Several managers were discharged, but such changes availed petitioner nothing. Several hurried certifications made in December, 1920, and the following month, i. e.; towards the end of the certification period, were rejected by petitioner as not conforming to contract specifications. The total amount of steel certified but not invoiced to the petitioner in 1920 was 44,248.66 tons, on which the contract price was $1,741,520.41. Petitioner had neither sold this steel nor ordered it to be loaded.

Petitioner's books were kept and its returns made on an accrual basis. Its books for 1920 were closed at the end of the calendar year, and its inventory taken on the basis of cost or market, whichever was lower. Respondent excluded from petitioner's purchase account for 1920 this $1,741,520.41, and from petitioner's 1920 closing inventory the market value of this steel, $1,204,851.28.

Petitioner contends that beneficial title passed to it when the steel had been certified, identified, and, as it claims, reduced to possession. It urges that this interpretation is confirmed by the provision and practice permitting it to resell certified steel for immediate delivery. It further contends that, since its books were kept on an accrual basis, they clearly reflect its income within the meaning of the Revenue Act of 1918 (40 Stat. 1057) and the Treasury Regulations promulgated thereunder, apparently irrespective of whether or not title passed. Respondent denies that legal or beneficial title thus passed to petitioner or that it became liable during the taxable year for the contract price of the steel, and contends, therefore, that the refusal to permit the cost to be debited and the inventory value to be credited was proper within the statute and regulations.

1. If beneficial title to the steel passed to petitioner it clearly became liable for the price (see Williston, Sales, § 561, and cases cited); in that event it could properly include such steel in its inventory and accrue the correlative liability. But in our judgment neither legal nor beneficial ownership of the lots here involved ever vested in petitioner. It is elementary that title passes when the parties intend that it shall pass and such intention is to be gathered from the contract and conduct of the parties. Uniform Sales Act, § 18, Williston, Sales, § 260 et seq. As, at the time of the contract, these were unascertained goods, admittedly no ti-

tle could or did then pass. Petitioner urges, however, that certification constituted an irrevocable appropriation, and that the contract and the conduct of the parties thereunder show an intent to pass title upon such certification. This contention, however, is untenable, in view, not only of the specific provisions that the Fleet Corporation would not guarantee the accuracy of the certifications and of the evidence that petitioner itself from time to time refused to accept certain of them, but especially of the express power of the Fleet Corporation to except and withdraw steel in some six enumerated classes even after certification thereof. Although this power was itself subject to the buyer's right to resell before withdrawal, it demonstrates that, in the absence of such resale (and there was none as to the goods here involved), the seller cannot be said to have made an irrevocable appropriation by the certification.

Although, as the Board assumed, certification served to identify the specific goods to be sold, the other specific provisions of the contract offer cogent objections to the argument that title passed upon certification. The quoted section of the contract provided that the excess steel "shall remain the property of the seller until delivery"; and in the same paragraph "deliver" is defined as certifying, checking, and actually loading on the cars. This provision clearly indicates that beneficial ownership was reserved until the steel was delivered to the carrier; this view finds further support in the statement that the contract is f. o. b. yards and the requirement that payment is to be made on the basis of railroad scale rates. The power of the buyer to place its representatives in the steel yards to recheck the shipment, arrange yard sales, and, under certain circumstances, have steel loaded, is not inconsistent with retention of title; the seller likewise could recheck, the right to resell did not give possession to the buyer or its agent, and the provision as to loading in the event of the seller's delay gave at the most custody for a limited purpose, to protect the buyer in case of resale. That this option to load at the seller's expense was entirely consistent with the retention of title is also shown by the fact that it did not apply in case the delay was due to strikes, fires, riots, etc.; such provisions would be meaningless if the buyer already had title to and dominion over the goods. Moreover, the seller had no right to tender the steel already certified unless the buyer forwarded loading orders; the latter had one year in which to do this and would not (except as to specified Pennsylvania steel) be liable for storage charges in the meantime. In the light of these related and specific provisions of the complete contract, we are entirely clear that no legal or beneficial title to the steel was vested in petitioner.

2. We come then to petitioner's contention that, under section 212 of the Revenue Act of 1918 (40 Stat. 1064) and article 22 of Regulation 45, its 1920 income should be computed in accordance with its books of account, which include a charge at cost for the certified, but undelivered and not resold, steel and a credit for the inventory value thereof at the end of the year. Section 212 (b) of the Revenue Act 1918 (40 Stat. 1057, 1064) provides:

"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * *"

Article 22 of Regulations 45 provides that:

"*Computation of Net Income.*—Net income must be computed with respect to a fixed period. Usually that period is twelve months and is known as the taxable year. Items of income and of expenditures which as gross income and deductions are elements in the computation of net income need not be in the form of cash. It is sufficient that such items, if otherwise properly included in the computation, can be valued in terms of money. The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income. If the method of accounting regularly employed by him in keeping his books clearly reflects his income, it is to be followed with respect to the time as of which items of gross income and deductions are to be accounted for. If the taxpayer does not regularly employ a method of accounting which clearly reflects his income, the computation shall be made in such manner as in the opinion of the Commissioner clearly reflects it."

Article 1591 of the same Regulation deals with the need of inventories, and specifies that:

"In order to reflect the net income correctly, inventories at the beginning and ending of each year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * * Title to the merchandise included in the inventory should be vested in the taxpayer and goods merely ordered for future delivery and for which no transfer of title has been effected should be excluded. * * * "

■ Although the proposition is not definitely asserted, petitioner apparently suggests that, where accounts are kept on an accrual basis, it may charge itself with the cost and credit itself with the value of goods purchased, even though title thereto has not passed. Respondent does not deny that the accrual system of accounting may reflect a taxpayer's income, but points to article 1581 to support the proposition that a proper inventory can include only goods the title to which has passed to the taxpayer. The accrual system is undeniably a proper method of accounting for taxation purposes (United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; American National Co. v. United States, 274 U. S. 99, 47 S. Ct. 520, 71 L. Ed. 946), and it is obvious that an accurate inventory at the close of the fiscal year is an essential part of such method. United States v. American Can Co., 50 S. Ct. 177, 74 L. Ed. ——, decided February 24, 1930; Rouss v. Bowers, 30 F.(2d) 628 (C. C. A. 2d). However, we need not now consider whether the "title" test set forth in article 1581 would be determinative in all cases; for it is at least clear that, before a liability may be accrued for tax purposes, the taxpayer must be unconditionally liable for the sum in question. Lucas v. North Texas Lumber Co., 50 S. Ct. 184, 74 L. Ed. ——, decided February 24, 1930; Brown Lumber Co., Inc., v. Commissioner, 9 B. T. A. 719, affirmed (App. D. C. November 4, 1929) 35 F.(2d) 880. An examination of the cases upon which petitioner relies illustrates this principle. In both United States v. Anderson, supra, and in American National Co. v. United States, 274 U. S. 99, 47 S. Ct. 520, 71 L. Ed. 946, the liability, though not matured during the taxable year in which the deduction was taken, was nevertheless at that time absolute. This distinction has recently been pointed out by the Supreme Court in Lucas v. American Code Co., 50 S. Ct. 202,

74 L. Ed. ——, decided February 24, 1930. See, also, Lucas, Commissioner, v. North Texas Lumber Co., 50 S. Ct. 184, 74 L. Ed. ——.

■ In the case at bar, however, petitioner's obligation for certified steel was clearly not absolute. The certification did not, as we have seen, constitute an irrevocable appropriation. Moreover, the ultimate liability was conditioned upon the Fleet Corporation not withdrawing the certified steel on the basis of the exceptions above mentioned. Consequently, we are satisfied that petitioner was not under the terms of the contract unconditionally liable for any of the quantities of steel here involved, and could not properly debit itself for the contract price during the taxable year 1920. We need not consider whether the situation would have been different had the Fleet Corporation's privilege of withdrawal been extinguished by the resale of this steel, for it is apparent on this record that none of the steel in question was either resold or delivered within the terms of the contract.

■■ Petitioner insists, however, that, as a matter of bookkeeping theory, a proper system of accrual accounting should indicate the taxpayer's financial condition as well as its income. It suggests that, had petitioner been required to furnish a financial statement to a bank at the end of the taxable year, it would have been fraud on its part to have concealed this probable loss of a half a million dollars. With this we are in complete accord; but the basis for a showing of yearly income may be very different from that of financial condition. The probability of future loss may well enter into an honest statement of financial condition; it is not, however, determinative of actual income, with which alone the tax law is concerned. See Lucas v. American Code Co., supra. As pointed out by the Board of Tax Appeals, a business, from a banker's point of view, is a continuous endeavor which may not be judged as of a single calendar year, but for income tax purposes its accounting system must, within the statute and regulations, reflect net annual income after permissible deductions have been made. We are satisfied that, within the meaning of the Act of 1918 and the Regulations promulgated thereunder, a deduction for loss based upon the difference between accrued liabilities and an inventory of assets, can include only such liabilities as are owing at the close of the taxable year, whether or not they be then matured.

Order affirmed.