## ST. MAURICE VALLEY PAPER CO., Limited, v. CONTINENTAL INS. CO.

District Court, E. D. New York.
Jan. 16, 1936.

Earl Appleman, of New York City, for libelant.

Haight, Griffin, Deming & Gardner, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for respondent.

GALSTON, District Judge.

The question presented is whether an open marine policy of insurance, issued by the respondent to the libelant, covered loss of cargo after it had been unloaded from the M. S. Horda at the port of Baltimore on August 21, 1933, and delivered to the consignee.

The libelant claims that the liability under the policy remained in effect after the unloading and delivery to the ware-

house company. The respondent contends that the insurance company's risk terminated when the goods were delivered to the warehouse company at Baltimore, and that the libelant's claim is against its inland underwriters who insured the goods after they were in the warehouse.

The policy contains, among others, the following important provisions.

"3. On goods, principally wood-pulp, paper, sulphite, etc. * * *

"4. At and from Grand'Mere, Quebec, and/or other place or places in the United States and/or Canada to ports and/or places elsewhere in the world generally excepting the Dominion of Canada * * *

"6. Merchandise covered hereunder is insured subject to the following clauses:— * * *

"The insured goods are covered, subject to the terms of this Policy, from the time of leaving the shippers' or manufacturers' warehouse, during the ordinary course of transit, until on board the vessel, during transhipment, if any, and from the vessel whilst on quays, wharves or in sheds, during the ordinary course of transit, until safely deposited in consignees' or other warehouse at destination named in Policy.

"12. Attaching on all shipments made on and after February 1, 1931, and this Policy is to continue in force thereafter until cancelled by either party giving the other thirty (30) days' notice in writing. * * *

"15. Goods * * * while on docks or elsewhere on shore against the risks of * * * floods (meaning rising navigable waters) and collapse and/or subsidence of docks, wharves, piers and/or quays.

"18. Authority is hereby given St. Maurice Valley Paper Company Limited to issue, subject to the terms and conditions of this Policy, this Company's certificates on any or all risks applying under this policy. * * *"

Bordley, the superintendent of the Bond Street Warehouse of the Terminal Warehouse Company, testified that he superintended the discharge of the steamship Horda; that the steamship arrived on August 21, 1933; that she docked on the east side of the pier with No. 1 hatch opposite the door to what has been designated as the B structure of the warehouse, with the other hatches opposite the apron in front of that part of the warehouse designated in the proofs as C. The work of discharg-

ing the cargo of paper began at 8 o'clock on the morning of August 22, 1933, and continued until 7 p. m. that day. The unloading was carried on by the Patapsco Ship Ceiling & Stevedoring Company, who had been engaged by the Furness-Withy Company, and who were paid by that company. The paper rolls were delivered to the employees of the warehouse at 50 feet from the ship's tackle. Some of the rolls of paper were taken into structure B and some into C. At the time that storage was effected in warehouse C, approximately 10,000 bags of sugar were in storage and had been there since April, 1933, on what is referred to as "permanent storage in bond." The superintendent testified that, as to the discharge of the paper for the Baltimore Sun, the buyer of the St. Maurice Valley paper, previous shipments had been discharged in the same way as that from the Horda; i. e., one hatch was discharged opposite to the last door in the B house and the other hatches were discharged opposite the pier warehouse. Ordinarily the rolls of paper from the pier warehouse were removed into the A and B structures within two or three weeks after the arrival of the ship. The length of time was, in a measure, dependent upon the arrival of some boat coming in. Decision for the removal was ordinarily that of the foreman of the warehouse, but under Bordley's direction.

It appears that the Baltimore Sun takes delivery of paper from the warehouse at the rate of approximately 100 rolls a day, and had a fifteen or eighteen day supply on storage in the warehouse at the time that the Horda arrived.

On the morning of August 23, 1933, about 15 men started to move the paper stored in C to A and B. About 3 o'clock in the afternoon the tide was rising unusually fast, and the force of men was increased. The work of removal was carried on as fast as possible up to about 7 o'clock, when water started to come in. The act of removal was carried on even after that, but then the hydraulic elevator went out of commission. The water meanwhile became knee deep, and work was stopped at 11 o'clock, leaving about 504 rolls damaged.

Prior to this occurrence, warehouse C had never been flooded.

The controversy centers about the construction of paragraph 6 of the policy of insurance. Was the damaged paper in a

shed, as the libelant contends, or in a warehouse, as the respondent urges?

The bill of lading shows that the paper was to be delivered "to the Baltimore Sun, % Terminal Whse. Co., Bond Street Whse., Baltimore, Md."

The Bond Street Warehouse is partly on land and partly over the water. The plant is divided into three adjoining warehouses. The part designated A in the proofs fronts on the street and is entirely on land. The part B, divided from A by a fire wall, is also on land. The house C is chiefly over the water. It is 197 feet in length, 116 feet at the shore end, and 75 at the off-shore end. It contains about 1,600 square feet of storage space. The structures A and B are of brick and steel and are six stories high. The structure C is of wood and corrugated iron, and is one story high. It rests partly on fill and partly on the pier, and the floor is three feet lower than the floor of the structures marked A and B.

From the stipulation of facts, it appears that the Terminal Warehouse Company charged the libelant for the use of space in buildings A, B, and C as soon as the paper was put in those buildings.

For the libelant to prevail, it is necessary to find that the structure marked C was not a warehouse. I think the proof conclusively establishes the contrary.

The stipulation of facts shows that, on being placed under cover, the rolls were in the custody of the warehouse company. The structure C was not a flimsy temporary structure. It was substantially built of corrugated iron supported by wooden beams, and the entire building was weather-tight. The flooring for 50 feet south of the south wall of the B house was concrete and the remaining part wooden planks. It is significant that the concrete floors of A and B replaced previous wooden floors of the ground floor. So much for construction. As for the nature of the use of the building, Bordley said it was not unusual to have goods stored in C permanently. Other commodities such as canned goods, tobacco, and malt spirits, in addition to paper and sugar, which were stored there at the time of the damage, were also at various times stored in house C.

It would seem then that, whether tested by usage or as a structure itself capable of permanently storing commodities, the house C should be classified within the fair intent of the policy of insurance as a warehouse. It was not a temporary structure such as one designates by "shed," nor was it put to the use to which some sheds are put. Its status as a warehouse moreover was recognized by the warehouse company in other ways. It is so termed in the Custom House bond. It is included as a warehouse in the license issued by the state of Maryland to the Terminal Warehouse Company.

Finally it must be observed that the goods had arrived at their destination. They were unloaded. They were in the possession, not of the ship, but of the warehouse company, the consignee. The contract of the carrier had terminated; the liability of the insurer went no further. Federman Co., Inc., v. American Insurance Co., 267 N.Y. 380, 196 N.E. 297; Crew-Levick Co. v. British & Foreign Marine Insurance Co. (C.C.A.) 103 F. 48.

The libel will be dismissed. If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.