**HILLCREA EXPORT & IMPORT CO., Inc. et al. v. UNIVERSAL INS. CO.**

United States District Court
S. D. New York.
Feb. 17, 1953.

Nathan, Mannheimer, Asche & Winer, New York City (Alfred B. Nathan and A. J. Asche, New York City, of counsel), for plaintiffs.

Bigham, Englar, Jones & Houston, New York City (Martin P. Detels and Vincent L. Leibell, Jr., New York City, of counsel), for defendant.

MURPHY, District Judge.

This is an action brought by purchasers of war surplus property on a valued policy of marine cargo insurance for the destruction by fire of such goods while in custody of the vendor in its structure. The cause having been tried by the court without a jury, the following are made by the court as

### Findings of Fact

1. At all the times referred to in the complaint: plaintiff, Hillcrea Export & Import Co., Inc., was and is a Delaware corporation; plaintiffs, Bristol-King Co., Inc., and Bachrack Bros., Inc., were and are New York corporations, and defendant, Universal Insurance Company, was and is a New Jersey corporation.

2. The matter in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

3. Prior to September 5, 1946, the Hillcrea Corporation received from the Surplus Property Office a circular listing merchandise which had been declared surplus and which was described as unused on the Aleutian Islands.

4. On September 5, 1946, the United States Government, through the director of surplus property for the Department of the Interior, signed an agreement in Washington, D. C., with the president of the Hillcrea Export and Import Corporation, which provided among other things that:

(a) "(T)he vendor, will sell to Hillcrea Export and Import Corporation, the purchaser, surplus property consisting principally of clothing, of all types and conditions, located on the Aleutian Chain of Islands of a declared cost not to exceed $493,000 at and for a price of twenty (20) percent of declared cost."

(b) The agreement being one "In furtherance of the foreign relief program" the property "shall be of a type

suitable and available for sale to relief agencies for actual relief purposes as determined by the vendor's representative, toward which sale the purchaser agrees to exert every effort", but "such property as remains unsold after all reasonable possibility of sale to relief agencies has ceased to exist may be sold in the continental United States, such sale being made only after consultation with the War Assets Administration."

(c) "The purchaser shall, upon delivery to it of this contract, deliver to the vendor a certified or cashier's check, payable to the Treasurer of the United States in the amount of $100,000 to be disbursed as follows: In view of the presence of ships at Adak and those enroute on charter to the purchaser, it is agreed that available property on the above islands will be delivered to such ships at such of the above islands as they may touch. Payment to the vendor for the value as computed above of the property delivered at any of the above islands, as determined by the representative of the vendor, shall be by book withdrawal from the above fund, any overage being payable immediately by purchaser, the vendor returning to purchaser any part of the fund not expended as aforesaid."

(d) "It is expected that the Government agency in possession will exercise its usual care for the protection of the property, but the Government will not be liable in the event of loss, damage, or destruction from any cause whatsoever. The Government, however, will refund to the purchaser any amount paid with respect to property lost or destroyed during the period allowed for removal and prior to actual removal."

(e) The Government "reserves the right to withdraw from sale any property prior to the removal thereof without incurring any liability except to refund to the purchaser any amount paid with respect to such property."

5. By a cashier's check dated September 12, 1946, payable to the Treasurer of the United States, for which payment was received on September 20, 1946, plaintiffs delivered to the vendor the sum of $100,000 specified in their contract.

6. Prior to November 25, 1946, plaintiffs Bristol-King, Inc., and Bachrack Bros., Inc., together, acquired a one-half interest in said contract of September 5, 1946, and the remaining one-half interest continued to be owned by plaintiff Hillcrea Export & Import Co., Inc.

7. On November 25, 1946, defendant delivered to plaintiffs in New York an open marine insurance policy No. 14381, which provided so far as relevant in this case with respect to amount of insurance and duration of risk:

(a) "Shipments insured valued at invoice, plus freight and charges plus 25% plus marine and war risk premiums payable by the assured."

(b) "(W)hen, by its terms, this insurance includes risk while on * * * dock, wharf, quay, or elsewhere on shore, this company is only to be liable for loss or damage * * * only by fire or flood (meaning rising navigable waters)."

(c) "This insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of the transit and continues during the ordinary course of transit, including customary transhipment if any, until the goods are discharged overside from the overseas vessel at the final port. Thereafter the insurance continues whilst the goods are in transit and/or awaiting transit until delivered to final warehouse at the destination named in the policy or until the expiry of 15 days (or 30 days if the destination to which the goods are insured is outside the limits of the port) whichever shall first occur."

8. A Marine Extension Clause of the same date attached to the policy provided:

"Notwithstanding anything to the contrary contained in or endorsed on this policy it is understood and agreed that in consideration of an additional premium the following terms and con-

ditions shall apply to all shipments which become at risk hereunder on and after November 25th, 1946.

"1. This insurance attaches from the time the goods leave the warehouse at the place named in the policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the destination named in the policy, certificate or declaration, or a substituted destination as provided in Clause 3 hereunder."

9. A declaration dated December 12, 1946, was submitted by plaintiffs' broker and accepted by defendant on that date for insurance in the amount of $200,000 covering that portion of the surplus goods at Dutch Harbor which was insured in the open valuation policy No. 14381 of November 25, 1946.

10. In connection with this declaration of December 12, plaintiffs' broker submitted to defendant a letter dated December 17, 1946, tabulating eight items with acquisition cost to the Government for the various quantities of each item. The total Government acquisition cost was stated at $249,870. The eight items of merchandise listed were: artics, wool undershirts, utility trousers, wool winter socks, wool winter drawers, utility shirts, leather face work gloves and stag coats.

11. Between December 2 and December 22, 1946, at Dutch Harbor various items declared surplus were removed from warehouses to Structure 159 located at the water's edge. These operations were accomplished by Government personnel and Navy trucks between buildings which were all part of the Navy installation at Dutch Harbor. Many items of surplus property, in addition to the eight sold by the Government to plaintiffs under the agreement of September 5, 1946, were so moved. Some items of surplus property stored in Structure 159 were not at the time subject to Government contract of sale.

12. Usually a single outlying warehouse was first depleted of property declared surplus and this property brought to Structure

159; then another outlying warehouse was emptied in the same manner.

13. At the time this surplus property left the various outlying warehouses it had not been completely segregated, banded for shipment or otherwise made ready for transport by sea. Some of the surplus property contracted for by plaintiffs was banded and segregated in Structure 159.

14. Structure 159 was equipped with various materials handling devices, such as forked lifts, four-wheel carts and dock mules, in order to move goods from its interior to within reach of ship's tackle.

15. During the night of December 21–22, 1946, a fire destroyed Structure 159 and all of the surplus goods inside it, including a substantial portion of the goods sold to plaintiffs under the agreement of September 5, 1946.

16. Up to the time of the fire, S. S. Pier Bend, the ship intended by plaintiffs to carry the cargo, had not arrived at Dutch Harbor.

17. Prior to the fire no surplus property had been moved from the inside of Structure 159 out on the dock so as to be loaded aboard a steamship in transit to plaintiffs at a Pacific port of destination.

18. No bills of sale had been furnished plaintiffs by the Government, because such bills were not made out until after the loading of the vessel and covered only items which have been actually loaded.

19. Prior to the commencement of the action, plaintiffs received back from the Government $49,974 which represented plaintiffs' purchase price of all of the surplus goods at Dutch Harbor sold under the contract of September 5, 1946.

20. Plaintiffs gave timely notice of the loss to defendant, and on August 27, 1947, served proofs of loss and interest on defendant.

### Discussion

The basic question presented is whether or not the destruction of goods by fire was within the duration of the risk covered by the policy of marine insurance. The controlling language, that in the Marine Ex-

tension Clause, attaches the insurance "from the time the goods leave the warehouse at the place named in the policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the final warehouse at the destination named in the policy, * * *." Concededly, none of the goods insured had left Structure 159 at the dock where they were being stored, for commencement of transit or otherwise. Plaintiffs insist however that the "warehouse" in this clause signifies the various outlying warehouses from which the goods in question were removed, and that "commencement of the transit" took place with their movement toward building No. 159 at the dock. Defendant, for its part, maintains that the "warehouse" signified was in fact building No. 159, and that movement of the goods from outlying warehouses did not constitute a "commencement of the transit" within the meaning of the policy.

The burden of proving that the alleged loss comes within the terms and conditions of the policy must be sustained by a preponderance of evidence on the part of plaintiffs. See Imperial Fire Ins. Co. v. Coos County, 151 U.S. 452, at page 462, 14 S.Ct. 379, 38 L.Ed. 231; Intermondale Trading Co. v. North River Ins. Co. of New York, D.C.S.D.N.Y., 100 F.Supp. 128, at page 131. As far back as Chief Justice Marshall, we are told that the question of duration of such risk "depends on the intention of the parties, and this intention must be found in their contract." Gracie v. Marine Insurance Co. of Baltimore, 8 Cranch 75 at page 82, 3 L.Ed. 492. "But," the court later warns in Reed v. Insurance Co., 95 U.S. 23, at page 30, 24 L. Ed. 348, "a rigid adherence to the letter often leads to erroneous results, and misinterprets the meaning of the parties.", and consequently without some knowledge "of the circumstances out of which [the agreement] grew and which surround its adoption, * * * it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed."

Language in marine insurance policies indicating the commencement of risk as "from the warehouse" often referred to as a "warehouse to warehouse" clause, appears to be of relatively recent origin. Under older and common duration clauses, such as "beginning the adventure", marine cargo insurance did not attach to any risk prior to the loading of the insured cargo on board the vessel which was to make the voyage. Cf. Bluefields Fruit & S. S. Co. v. Western Assur. Co. of Toronto, 5 Cir., 265 F. 221. The "warehouse to warehouse" clause extended coverage to risks prior to loading, but how far is the question involved here. This has not been the subject of any considerable reported litigation. Indeed counsel have failed to call attention to a single case even remotely in point and the court has found but a few.

Under this or similar clauses in marine insurance, a few cases have been concerned with the expiration, rather than commencement, of such risks. In Martin v. Nippon Seas, 3 Commercial Cases 164, the policy covered the goods until safely delivered to the consignee. The goods were entered in the custom house where they were held in the name of the consignees, subject to payment of certain charges. While there the goods were destroyed by fire. The court found as a fact that for custody purposes the custom house was that of the consignee, and delivery to it was one to the consignee. On the other hand, in Ganiere v. Eastern Co., 7 Lloyd List Law Reports, 188, under a warehouse to warehouse clause, goods were received at a Petrograd custom house and later seized by persons purporting to act on behalf of the Russian government. The court held as a fact that the custom house was not holding as agent of the consignee, and consequently the risk had not terminated.

Similar determinations have been made in the federal courts. In one case, under a warehouse to warehouse clause, a cargo of cotton deposited in a custom house was destroyed by fire. The court determined as a fact that the risk covered by marine insurance did not terminate. Lindo v. Ocean Marine Ins. Co., D.C., S.D.N.D.Cal., 27 F. 2d 956, affirmed, 9 Cir., 30 F.2d 782. On the other hand, under a similar clause, a

cargo of paper was found on the facts not to be covered by marine insurance after it had been deposited in a shed which was used as a warehouse, and damaged by rising tidal waters. St. Maurice Valley Paper Co., Ltd. v. Continental Ins. Co., D.C. E.D.N.Y., 13 F.Supp. 346, affirmed without opinion, 2 Cir., 85 F.2d 1018. If these cases demonstrate anything, it appears to be that "whether goods covered by a marine policy containing a 'from warehouse to warehouse' clause" are within or outside the duration of risk, "is a question of fact from the circumstances of each particular case." Ocean Marine Ins. Co. v. Lindo, supra, 30 F.2d 782 at page 784.

The instant question then, properly one of fact, must accordingly be resolved in the light of relevant facts which have been found. Structure No. 159, labeled by plaintiffs as "Transit Shed No. 159" and by defendant as "Warehouse No. 159", and described in those terms but with considerable inconsistency by witnesses for each side, was a completely enclosed building used for the storage of goods, temporarily or otherwise. It might quite easily measure up to almost any dictionary definition of "warehouse." But finding as a fact that this structure was "the warehouse" within the meaning of the policy is far from resolving the controversy. This is so because, prior to their deposit in building No. 159, the goods had left outlying buildings on the Navy installation at Dutch Harbor, which both sides concede were warehouses. Remaining then is the crucial question whether, in the light of all of the evidence, the goods had left these outlying warehouses "for the commencement of the transit" within the terms of the policy.

■ We think not. The policy contemplated marine cargo insurance for an ocean voyage. Various goods were removed from the outlying warehouses over a period of three weeks. These goods consisted not merely of the eight items under contract of sale to plaintiffs but more than twice as many other items declared surplus and not sold to plaintiffs or apparently to anyone else. The movement of the goods took place entirely on the property of the vendor, from some of its buildings

to another of them. The operation was undertaken under the vendor's direction, with its equipment and its personnel. The S. S. Pier Bend, the ship to which the vendor had contracted to deliver the goods, had not arrived up to the time of the fire, or apparently at any time thereafter. The goods as removed from the outlying warehouses did not yet constitute the plaintiffs' cargo subject to this insurance contract. Inspection, sorting and banding the goods or some of them, allocated to plaintiffs, remained to be accomplished within building No. 159. Under the circumstances it cannot be asserted on the basis of a preponderance of evidence that the particular goods insured had left the outlying buildings "for the commencement of the transit" contemplated by the ocean cargo policy of marine insurance here involved.

As the court observed in Reed v. Insurance Co., supra, 95 U.S. 23 at page 30, with respect to construction of duration clauses in marine insurance policies, "A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities." Under the contract of sale of the goods in question, the vendor agreed to "refund to the purchaser any amount paid with respect to property lost or destroyed during the period allowed for removal and prior to actual removal." Accordingly, the plaintiffs received back from the Government $49,974, which represented plaintiffs' purchase price of all the surplus goods at Dutch Harbor under the contract of sale. The vendor thus agreed to assume the risk of loss of these goods while in building No. 159, and in fact executed that agreement.

It cannot be denied that the vendor had actual and exclusive control, custody and possession of the goods, as well as the building in which they were stored, at the time of their destruction. Whether in addition the vendor had title to the goods at that time need not be resolved in order to determine the ultimate question of fact, viz., whether the goods were destroyed within the duration of the risk covered by

 

the policy. In passing, however, it should be noted that the contract of sale explicitly provided that "the vendor, will sell to * * * the purchaser", and that the goods "will be delivered to such ship at such of the above islands as they may touch. Payment to the vendor for the value * * * of the property delivered * * * shall be by book withdrawal from the above fund * * *." The testimony was to the effect that the $100,000 trans-. ferred by the vendee to the vendor was placed in a special account, not to be used by the vendor until the goods were accepted by the vendee. Moreover, the contract of sale further explicitly provided that the vendor "reserves the right to withdraw from sale any property prior to the removal thereof without incurring any liability except to refund to the purchaser any amount paid with respect to such property." Although no such withdrawal was made, all of these circumstances indicate that title to the goods may well have remained with the vendor at the time of their destruction. Cf. Uniform Sales Act § 19; Barde Steel Products Corp. v. Commissioner of Internal Revenue, 2 Cir., 40 F.2d 412, at page 414. If such was the case, then there would be additional reason to suppose that the goods were at the risk of the seller, and not the purchaser, at the time of their destruction. And this would be a circumstance supporting the finding that the loss occurred before the commencement of the risk covered by the policy.

This disposition makes unnecessary any determination with respect to the contention of defendant, that plaintiffs concealed from the underwriter information material to the risk, when they allegedly failed to disclose that their purchase price of the goods was about one-quarter of the amount of the insurance sought and that they were obliged to offer the goods to third parties for about one-third of the amount of such insurance.

### Conclusions of Law

1. The court has jurisdiction over the parties and the subject matter of this controversy.

2. The duration of the risk covered by the insurance in this case did not commence when various surplus goods, including those sold to plaintiffs under the contract of September 5, 1946, were moved by various Navy trucks over a period of almost three weeks from outlying warehouses to Structure 159 for storage and preparation of some of the goods for loading aboard ship.

3. The marine cargo insurance in question did not attach to the goods covered in that policy because none of them had left their place of storage in Structure 159 at Dutch Harbor for the commencement of the transit to a final port of destination.

4. Judgment for defendant.