Samuel C. Coleman, J.
This is an action by two plaintiffs, the shipper of goods and the one to whom it had sold the goods. The action relates to a shipment of tallow from Houston, Texas, to Hamburg, and is brought against the ocean carrier on the bill of lading, against the marine underwriter under a policy of insurance, and against a cargo inspector and surveyor who had issued his certificate as to quantity. The bill of lading, the insurance certificate and the inspector’s certificate all refer to a shipment of 501 tons of tallow. In fact, only 375 tons were received by the vessel and that was the quantity which was delivered on discharge in Hamburg.
The tallow had been purchased by plaintiff Plata from one Marco and in turn sold by it to plaintiff Nordhandel. Plata paid Marco as for 501 tons, and Nordhandel paid Plata as for that quantity. Nordhandel has not sued Plata but has joined with it as plaintiff in this action although their respective positions are contradictory, Nordhandel having paid for more than it received; and Plata during the pendency of this action assigned to Nordhandel Plata’s claims against the defendants because of the one payment by Nordhandel. Additional facts will be stated with respect to the separate claims. There are also cross complaints.
I
CLAIM AGAINST MARINE UNDERWRITER, LANCASHIRE
The claim against the marine underwriter is based upon a certificate of insurance which insured the tallow, 1,105,866 pounds or 501 tons, shipped on the vessel, 8.S. Vulkan. The policy was broader, however. . It contains this clause: “ This insurance attaches from the time the goods leave the warehouse at the place named in the policy [Houston] for the commencement of the transit.” Two questions present themselves: Did the risk attach as to either of the plaintiffs ? Did either plaintiff have an insurable interest in the tallow? As to the first question: Did the tallow, not having been delivered to the vessel, leave the ‘1 warehouse * * * for the commencement of the transit ’ ’ ? The tallow was purchased in the first instance, as I have said, from Marco. Marco had three tanks interconnected so that the tallow could run from one tank to another. All three tanks were connected with a gauge pump through which the tallow had to flow before it would reach the final hose from which it would be deposited into the ship’s tanks. Without going into detail, I am much more than satisfied that the missing tallow, as it has been referred to, did not pass beyond the gauge pump,did not enter the connecting hose to the vessel, and was not deposited in the ship’s tanks. I am much-more than satisfied that *248 Marco permitted only 375 tons to pass through the gauge pump and into the vessel and that he diverted the balance by transferring it from one tank to the other by means of the interconnecting pipes. In such circumstances did the tallow ever leave Marco’s warehouse, so to speak, and was it in transit in the sense that it had started on the way to the vessel? There is no liability upon the underwriter unless it did.
The plaintiffs allege that the tallow was insured 1 ‘ from the time the goods left the storage tanks ” of Marco. They say that the tallow did leave the storage tanks — the warehouse — and they invoke the analogy of trucks leaving a warehouse to deliver merchandise to a steamship pier. The analogy is inexact. Assuming the Marco tanks to be the equivalent of a warehouse, the undelivered tallow never left the warehouse; never, in the language of the complaint, “ left the storage tanks ”. It was merely transferred from one part of Marco’s warehouse or storage tanks to another. Merchandise taken from a warehouse, placed on a truck and started on its way to a pier, has physically been separated from the warehouse and may be said to be in transit. Here there was no physical separation. The tallow which should have gone into the vessel never left Marco’s establishment and always remained part of the mass in his tanks; it remained always on his premises (cf. Hillcrea Export & Import Co. v. Universal Ins. Co., 110 F. Supp. 204, affd. 212 F. 2d 206, cert, denied 348 U. S. 834). It had never been “ checked out ”, as a loaded truck might have been.
Indeed, plaintiffs seem to accept this conclusion. In their brief they say that “ while flowing through the pipes, the pump and the hose, the tallow was still in Marco’s possession and custody; it just flowed from one of Marco’s receptacles to another of Marco’s receptacles; it left Marco’s custody and possession within the ship’s tank, while flowing out of the hose into the tank ” (cf. Finding of Fact 11 [110 F. Supp. 204, 206, supra] referred to by the Court of Appeals, 2d Circuit, in affirming the District Court [212 F. 2d 206, supra]). We need not go so far as to say that tallow should actually have passed into the ship’s tank before the risk attached; that would make the “ warehouse to warehouse ” clause meaningless. But certainly until tallow passed through the gauge pump it was still in Marco’s plant; it was only after it had passed through the pump for the final passage into the vessel that it was “ in transit ”; only then that it had reached the point of no return; and only 375 tons “ left Marco’s custody and possession”. It is a fiction to talk of 501 tons or of any quantity beyond 375 tons, of any balance. There was no balance. If the tallow had been *249 loaded onto trucks from the tanks to be deposited on the pier, it would not be “in transit ” while the trucks were still within Marco’s establishment. Similarly it was not “in transit” here and the risk had not attached.
On the question of insurable interest, what the plaintiffs said to the marine underwriter, in effect, is this: Insure our goods from warehouse to warehouse. But the tallow that was not delivered to the vessel never belonged to Plata and of course never belonged to Nordhandel. The contract between Marco and plaintiff called for delivery f. o. b. steamer, and until the tallow passed the gauge pump, at least on its way into the vessel, it was Marco’s and no one else’s. Marco’s interest was certainly not being insured and neither Plata nor Nordhandel had title to merchandise not delivered. It was not theirs, and not theirs to insure. The plaintiffs suggest that the buyer of goods may have an insurable interest in merchandise contracted to be bought and may insure that interest; but it was not that interest which was being insured here. The underwriter was not insuring performance of the contract nor Marco’s interest in the tallow, nor the value of the contract, but tallow belonging either to Plata or Nordhandel and in the ship’s holds or “ in transit ”. It was not insuring Plata against Marco’s fraud in preventing a larger quantity of tallow from becoming Plata’s. I see no liability on the marine underwriter, and the complaint against it is dismissed.
II
CAUSE OF ACTION AGAINST THE CARRIER, HAMBURG AmBRIKA LlNIE
The case against the carrier is based upon the recital in the bill of lading that the larger quantity (501 tons) had been received on board. The bill of lading, of course, does establish a prima facie case against the vessel in favor of the shipper, but this is overcome by the proof that the additional quantity was not in fact received by the vessel. Plata, therefore, apart from the fact that it had indorsed the bill of lading to Nordhandel, has no cause of action against the steamship (Carriage of Goods by Sea Act, § 3, subd. [4]; U. S. Code, tit. 46, § 1303, subd. [4]; cf. Spanish Amer. Skin Co. v. The Ferngulf, 242 F. 2d 551).
A different situation presents itself as to Nordhandel. If it was a purchaser for value of the documents under which the property in the tallow was being transferred to it in reliance upon the recital of quantity in the bill of lading, it could hold the vessel to that recital. So much the vessel concedes, as indeed it must. (Bills of Lading Act, § 22; U. S. Code, tit. 49, § 102, which makes the carrier liable to “ the holder of an order bill
*250 who has given value in good faith, relying upon the description therein of the goods * * * for damages caused by the nonreceipt by the carrier of all or part of the goods upon or prior to the date therein shown, or their failure to correspond with the description thereof in the bill at the time of its issue ’ ’ [cf. The Ferngulf, 242 F. 2d 551, supra].) A good part of the discussion in the briefs centered upon the nature of the transaction between plaintiff Plata and Nordhandel and of the manner in which payment was to be made by Nordhandel. Plaintiffs rely greatly upon the fact that the arrangement was by way of a c. i. f. contract. They insist that Nordhandel was a purchaser of documents in good faith and that it can therefore hold the vessel to the recital in the bill of lading. The vessel contends that Nordhandel was not such a purchaser; that the bill of lading was not negotiated as a document of title and that Nordhandel was merely buying tallow from Plata on an ordinary purchase and sale agreement. But whatever the commercial arrangement between Nordhandel and Plata, Nordhandel’s argument overstates the effect of the Bills of Lading Act. To be sure, the statute enlarges the liability of the vessel to certain holders of the bill of lading other than the consignor; as to them it holds the vessel to the recitals in the bill. But it imposes that liability only if the holder in question relied upon the statements as to quantity in the bill (cf. General Foods Corp. v. The Felipe Camarao, 172 F. 2d 131, 133; Strohmeyer & Arpe Co. v. American Line S. S. Corp., 97 F. 2d 360, 362). Quantity is subsumed under description. A recital that 501 tons were received when only 375 tons were actually received is an incorrect description.
There was no reliance by Nordhandel upon the statement as to quantity in the bill of lading. I have referred to the strange circumstance that although there is conflict of interest between Plata and Nordhandel, they join through the same attorneys in one complaint against all others connected with the shipment. They must have considered their positions fully and the complaint must reflect that consideration, and in the circumstances here I think the plaintiffs should be held to their complaint. According to the complaint, Nordhandel does not even sue as one to whom a bill of lading has been negotiated as a document of title; the complaint says nothing about a bill of lading. Although the complaint states in an early paragraph, as was indeed the fact, that the agreement between plaintiff and Nordhandel was on a c. i. f. basis, it says only that on June 28, 1953, Marco presented its invoice to Plata for $42,575.84; that on June 30, Plata sent its invoice to Nordhandel for $51,415.79 and that
*251 Nordhandel “ replying upon the weight certificate * * * issued by defendant * # * Martin ’ ’ paid Plata the full amount. As the plaintiffs themselves put it in their brief — “ According to their f. o. b. and c. i. f. contracts, Plata and Nordhandel were only interested in the quantity the ship actually received. They could expect certificates expressing the quantity actually loaded. ” In the deposition of Nordhandel’s representative in Hamburg, it is made clear that whatever value was placed on the shipping documents, Nordhandel paid the full amount relying upon Martin’s certificate as to quantity. “We relied on the certificates of * * * Martin * * * when we made full payment. ” The answer to the question: “Did you think that the tallow was actually physically weighed at any stage of the transportation?” was, “Yes, we relied on the certificate. ” Nordhandel can have the benefit of the statute only if in fact it was ‘1 relying upon the description [in the bill of lading] of the goods. ” It did not do so; it has no greater rights than Plata and it cannot recover against the vessel.
Ill
CAUSE OE ACTION AGAINST CARGO INSPECTOR MARTIN.
The plaintiffs allege a cause of action against Martin on the certificate which he issued that 501 tons had been delivered on board. Martin’s concern with the transaction is as follows: A long-established and experienced weigher, he had been retained by Marco to measure the amount of tallow, as it was being delivered to the vessel, and to certify the amount. The contract between Marco and Plata called for such a certificate; similarly, the contract between Plata and Nordhandel; and of course Martin knew its purpose and was familiar with the extent to which certificates of this kind are relied upon in shipping and commercial transactions. I have already pointed out that Marco diverted tallow from one of his tanks to another, and it seems to me that Martin negligently — • grossly so — lent himself to the scheme. He merely measured the amount of tallow that left Marco’s tanks without troubling himself to find out where it actually went; and as to ascertaining the amount actually received by the vessel, he arbitrarily contented himself with measuring the ullages — the space between the top of the tallow ■ in the ship’s tank and the top of the tank itself. But this factor was insufficient to enable him to determine the exact quantity; he needed the vessel’s calibration chart. Such a chart was not available; nevertheless he issued his certificate which recited that 501 tons had been delivered. Several months later in effect *252 he recognized a discrepancy; only 375 tons had been placed on board. When Martin was retained by Marco he was told that the shipment was for the account of Plata and his certificate recites that it was Plata that had delivered to it 501 tons. Martin’s liability to Plata seems to me to be plain (Ultramares Corp. v. Touche, 255 N. Y. 170; danger v. Shephard, 233 N. Y. 236).
Martin argues that since Plata has been paid in full by Nordhandel, Plata has not been damaged and there can be no recovery ¿gainst him by Plata. But Plata overpaid Marco on the basis of Martin’s certificate negligently issued and Martin is in no position to assert that Plata cannot recover the alleged overpayment (Joannes Bros. Co. v. Lamborn, 237 N. Y. 207; Brady & Co. v. Board of Educ. of School Dist. of City of N. Y., 222 App. Div. 504; cf. Packard Fabrics v. Deering, Milliken & Co., 94 N. Y. S. 2d 671, 673, affd. 277 App. Div. 753, affd. 302 N. Y. 643). Moreover Nordhandel is looking to Plata for reimbursement (the basis for the assignment from Plata to Nordhandel) and Martin is not the one to suggest to Plata that it withhold making a claim against him until it has satisfied Nordhandel.
Nordhandel, too, has asserted a claim against Martin, but it seems to me unnecessary to consider whether the force of Martin’s certificate is spent on reaching Plata (cf. Ultramares Corp. v. Touche, supra). Plata has assigned its claim to Nordhandel, and the plaintiffs in their briefs, which they have jointly filed, assert that the measure of damages, whether Plata’s or Nordhandel’s, is the same. In such circumstances, Nordhandel is adequately protected by what it will receive from Plata under the assigment. The amount overpaid by Plata is $10,675.54 and there will be judgment in favor of Nordhandel as assignee of Plata against Martin in that amount with interest from August 5, 1953.
The complaint of Nordhandel is dismissed and it is unnecessary to consider the various cross complaints, underwriter against Plata, vessel and Martin, and vessel against Plata and Martin. (Marco is not a party here.) Martin alone, in my view, is at fault for having started in motion a chain of untoward events by his incorrect certificate, upon which Plata relied in issuing a certificate of insurance and in filling up the bill of lading and upon which the vessel, in its turn, relied in issuing the bill of lading.