**O'Brien Machinery Company v. Fireman's Fund Insurance Company**

*O'Brien, Pressman & Libetti,* for plaintiff.
*Bennett & Bricklin,* for defendant.

SLOANE AND JAMIESON, P. JJ., January 20, 1967.—
Plaintiff sued defendant to recover on defendant's in-
surance policy for damages sustained when its gen-
erator was damaged by fire in the warehouse of a com-
mon carrier. On trial without a jury, we gave a ver-
dict for plaintiff in the amount of $7,500. Defendant
excepts to the verdict as against the law and the
weight of the evidence and further excepts to the
amount awarded.

Plaintiff purchased a generator and hired Charles
Benjamin, a rigger, to haul it from the point of pur-
chase in Camden, N. J., to plaintiff's warehouse in
Philadelphia, Pa. Because of the machine's position
near a loading platform in Camden, it could be rolled
onto Benjamin's rig, but its weight prevented its re-
moval into plaintiff's warehouse without a special
movable crane. Thus, the machine was taken to Benja-
min's warehouse in Philadelphia to remain until the
required crane, truck, and labor could be brought
together.

Plaintiff made several requests to Benjamin to
complete delivery, but at no time until the fire which

destroyed the machine was Benjamin able to gather all the necessary equipment and labor. The failure to do so was directly related to bad weather and other jobs on which Benjamin was then engaged. One of these other jobs was at the behest of plaintiff, a job which began at a time after the original pick-up of the machine involved.

The machine was removed from Camden on November 29, 1963, and destroyed by a fire in Benjamin's warehouse on February 26, 1964. During this period, O'Brien was insured by defendant (policy admitted) for loss or damage to equipment incurred while "in ordinary course of transit". Proof of loss by fire while in Benjamin's warehouse is admitted, but it is disputed whether the generator was then "in ordinary course of transit".

The cases are not entirely harmonious on the question of what is "in transit".\* See the excellent discus-

---

\* On the question when transit begins, see, e.g., Insurance Co. of North America v. Newtowne Mfg. Co., 187 F. 2d 675 (1st Cir. 1951); Kessler Export Corporation v. Reliance Insurance Company of Philadelphia, Penna., 207 F. Supp. 355 (E. D., N. Y., aff'd. per curiam, 310 F. 2d 936 (2d Cir. 1962)); Hillcrea Export & Import Co. v. Universal Ins. Co., 110 F. Supp. 204 (S. D., N. Y. 1953, aff'd. per curiam 212 F. 2d 206 (2d Cir. 1954)), cert. denied, 348 U. S. 834 (1954); Koshland v. Columbia Ins. Co., 237 Mass. 467, 130 N. E. 41 (1921); Williams v. Mannheim Ins. Co., 237 Mass. 477, 130 N. E. 41 (1921); Royal Ins. Co. v. Texas & G. Ry. Co., 53 Tex. Civ. App. 154, 115 S. W. 117 (1909); Starlight Fabrics, Inc. v. Glen Falls Ins. Co., 297 N. Y. 426, 79 N. E. 2d 812 (1948); Plata & Norshodel v. Lancashire, 1958 Am. Mar. Cas. 2329, aff'd. 6 App. Div. 2d 1036, 178 N. Y. S. 2d 1021 (1958); Brammer Corp. v. Holland-America Ins. Co., 228 N. Y. S. 2d 512 (1962), aff'd. 240 N. Y. S. 2d 940; Mayflower Dairy Products, Inc. v. Fidelity-Phoenix Fire Ins. Co., 9 N. Y. S. 2d 892 (1938); San-Nap-Pak Mfg. Co. v. Firemen's Ins. Co., 47 N. Y. S. 2d 542 (1944), aff'd. 51 N. Y. S. 2d 754 (1944).

Termination of transit is discussed in the following cases: Wheeler v. London Guarantee & Accident Co., 292 Pa. 156, 140 Atl. 855 (1928); Rupp v. Hanover Fire Ins. Co., 311 S. W. 2d 58 (Kan. App.,

sion in Wolf, In Transit—A Definition, 29 Brooklyn L. Rev. 218 (1963). Quoting from Gulf Insurance Co. v. Ball, 324 S. W. 2d 605 (Tex. Civ. App. 1959), the author suggests that the definition of "in transit" include provision for an interruption so long as it is either unavoidable or is in furtherance of transit and there is no abandonment. Although it might be stating the case too strongly to say here that the interruption was unavoidable for its entire three months' duration, the delivery to Benjamin's premises at its inception can be said to have been in furtherance of the transit insofar as delivery to plaintiff's warehouse could not have been made at that time. Certainly there was no abandonment of transit or of the machine in the case at bar; both plaintiff and Benjamin clearly contemplated its eventual removal to plaintiff's warehouse.

In Gulf Insurance Co. v. Ball, supra, a truck carrying tires went off the road into a ditch. The driver spent two days trying without success to remove the truck's trailer from the ditch, then went to get help, leaving the trailer securely locked. The tires were damaged by fire, but the court held that they were still in transit and had not been abandoned, quoting the following language from Hailey v. Oregon Short Line R. Co., 253 Fed. 569, 571 (S. D., Idaho 1918) :

"To say that the phrase 'in transit' is applicable only while a shipment is actually moving is to give to it an unusual and strained construction. Ordinarily a shipment is understood to be in transit from the point of origin until it reaches the point of destination. So long as it is in the course of being delivered to the place to which it is being shipped, it is in transit".

---

1958) ; Fuller v. Home Indemnity Co., 318 Mass. 37, 60 N. E. 2d 1 (1945) ; Hanson v. National Surety Co., 257 N. Y. 216, 177 N. E. 425 (1931) ; Underwood v. Globe Indemnity Co., 245 N. Y. 111, 156 N. E. 632 (1925).

Interruption of transit is discussed in the text.

There appears to be only one case in Pennsylvania which deals with the dispute in point: Brown v. American Casualty Company of Reading, 34 D. & C. 2d 204 (1964). There, the court had to determine whether goods in a truck that was burglarized while parked overnight were "in transit" and thus covered under an "in transit" insurance policy. Looking outside Pennsylvania for guidance, the court first said that goods need not be in actual movement to be "in transit", citing Hailey v. Oregon Short Line R. Co., supra. Noting that interruptions in actual movement caused by accidents to trucks, failure of headlights or lateness of hour will not put transit at an end, the court held that transit continues during delays necessary to and an incident of the transportation involved. Thus, when delivery trucks brought undelivered meats back to their garage at the end of the day to attempt delivery again the next day, the goods were held to be in transit while the trucks were parked overnight: cf. J. Ries & Sons, Inc. v. Automobile Ins. Co., of Hartford, Conn., 121 N. J. L. 493, 3 A. 2d 610 (1939); Koury v. Providence-Washington Ins. Co., 50 R. I. 118, 145 Atl. 448 (1929).

Defendant relies heavily on Dealers Dairy Products Company v. Royal Insurance Company, Ltd., 170 Ohio St. 336, 164 N. E. 2d 745, 80 A. L. R. 2d 441 (1960), cited in the Brown case. There, claimant was transporting machinery in its own truck from Detroit to Buffalo. En route, in Cleveland, the machinery was unloaded and left for two days at a truck terminal owned by a third party while the truck was used to make an ice cream delivery to one of claimant's customers. The machinery was discovered to be stolen by the time the driver returned to pick it up two days later. The court said, at page 444:

" . . . Of course, minor deviations from the customary route and *temporary stops*, even overnight,

for the convenience of the operator of the conveyance and for other purposes connected with the carriage, will not remove the goods from the transportation.

"But the words, 'in transit' and 'transportation', as they appear in the policies before us and as construed under the circumstances here involved, do not embrace a period of days during which, *for the convenience of the insured and to divert the transporting conveyance to other business of the insured*, the goods are unloaded and deposited on designated premises and left there at rest while the transporting conveyance departs and is used on another transportation project foreign to the original shipment". (Italics supplied).

It is apparent why defendant places all its reliance on this case, for under it "temporary stops" might not include those of almost three months' duration, as in the case before us. The emphasized passage, "for the convenience of the insured and to divert the transporting conveyance to other business of the insured", seems close to describing the facts of the present case, since part of the delay in assembling equipment by the carrier was due to another job that was done at the behest of plaintiff.

Dealers Dairy Products, however, is not on all fours with the facts facing us. In that case, plaintiff was its own carrier, with complete control over the carriage of its own goods. It clearly ordered its driver to interrupt transit of its goods in order to transport other goods. But in our case, the carrier was independent of plaintiff, and could not have completed delivery posthaste regardless of any further jobs required of it by plaintiff.

A case that sheds a different light upon the problem is Exchange Lemon Products Company v. Home Insurance Company, 235 F. 2d 558 (9th Cir. 1956). In that case, the assured turned its goods over to an in-

terstate carrier to be transported to the carrier's warehouse and held pending sale and further shipping instructions by assured. This arrangement was pursuant to "in transit privileges", allowing one rate for pick-up, storage, and final delivery. The policy under which suit was brought covered the goods "while in transit", but not "if such property is in storage". Considering the trade customs and usages in such situations, the court said that the goods were probably in transit when they were destroyed by a flood in the carrier's warehouse eight months after they were brought to the warehouse. It held, however, that the policy's exclusion of goods in storage precluded recovery despite any finding on "in transit". That these goods would normally be considered in transit, given the custom of the trade in obtaining "transit privileges", was said to be apparent on the face of the policy, since otherwise there would have been no need to include the storage clause if technical transit were felt to suspend automatically upon such an interruption of actual movement.

The facts in the Exchange Lemon Products case and those before this court are far from dissimilar. In both, the goods were turned over to an independent carrier; there was just one charge for the entire transportation; the goods were at all times in the custody of the carrier; and the interruption of actual movement was inherent in the requisites to transporting the goods. An important similarity in the Exchange Lemon Products case and the Dealers Dairy Products case should not, however, be overlooked. In both, the interruption of actual movement was directly ordered by the assured shipper. The different meanings of "in transit" found in these two cases must rest on the following important difference in their fact situations: The shipper in Dealers Dairy Products acted as its own carrier, whereas the shipper in Exchange Lemon

Products used an independent carrier. Although the significance of this difference was not articulated, it lay in the bargain struck between the assured and the insurance company. When a shipper is its own carrier, the parties to the insurance contract must contemplate that while "in transit", the goods will still be in the custody of the shipper. No real change occurs in the nature of custody and protection of the goods except that they are transferred from a place of storage to a place of transportation within the same organization. Since actual custody remains at all times in the hands of the assured shipper, the new protection that he buys with an "in transit" policy will relate more directly to the risks of actual movement. Contrast this with the protection contemplated by the parties when the shipper turns his goods over to an independent carrier. Here, an entirely new custody comes into being. The shipper here will want "in transit" protection from the time the goods leave his custody until such time as the goods reach their final destination.

We have before us, then, a case with the following general facts: an "in transit by a common carrier" insurance policy; an assured shipper who deals in machines of all types, including the very largest; the turning over of a very large machine to a common carrier; an interruption of actual movement caused by the size of the machine; further delays in actual movement caused by the size of the machine and other jobs required of the carrier, including one for the insured; a single charge by the carrier for transportation; requests by the assured shipper for delivery of the machine; and, finally, the machine's destruction by fire while still in the custody of the carrier nearly three months after the machine was first picked up.

Further distillation of the facts shows a contemplation of the parties that the policy would include risks of transporting large machines, that delays for the

purpose of collecting special rigs may be inherent in the transporting of large machines, and that custody of the machine would remain in the hands of the carrier from the time of pick-up until the time of delivery. In view of the Exchange Lemon Products case, in the absence of a phrase excluding protection while "in storage", the facts support a finding that the goods were in transit at the time of the fire. Exceptions to this finding are dismissed.

Verdict here was against defendant in the amount of $7,500. This figure was based on testimony elicited by both parties concerning the market value of the damaged machine. Defendant complains that the insurance contract, which plaintiff incorporated into its complaint, provided that the machine could only be valued at $2,500, the cost of the machine to plaintiff. The operative language is as follows:

"5. Valuation. Goods and merchandise shipped to or for account of the Assured shall be valued at actual invoice cost to the Assured together with such costs and charges (including the commission of the Assured as selling agent) as may have accrued and become legally due thereon. Goods and merchandise which have been sold by the Assured and have been shipped to or for account of the purchaser (if covered hereunder) are valued at the amount of the Assured's selling invoice, including prepaid or advanced freight. Goods and merchandise not under invoice shall be valued at the actual cash market value at point of destination on the date of disaster less any charges saved which would have become due and payable upon delivery at destination".

This clause covers three major situations: (1) goods purchased but not yet sold by assured damaged while being shipped to or for his account; (2) goods sold by assured and being shipped to purchaser; (3) goods not under invoice.

Thus, the loss to assured is calculated at his cost as evidenced by invoice if he hasn't sold the goods; but if he has sold them, his loss is the selling price as evidenced by invoice. When assured has only purchased the machine, but has not sold it to another, his loss (without contemplated, speculative profits) is to be measured by the price he paid for it plus any expenditures he has made on it, less salvage.

Only if assured has sold the machine and is obliged to effect delivery of that machine is his loss to be determined by the amount he would have received for such a sale.

Here, the machine had not been sold. The price paid was $2,500. The cost of making it ready for shipment was between $500 and $700; painting and repairing cost between $300 and $400. The cost of rigging and hauling was not paid. Salvage value was agreed to be $430.

Defendant's exception to the amount of the verdict is sustained. Plaintiff's recovery will be $3,020.