## LINDO v. OCEAN MARINE INS. CO., Limited, et al.

District Court, N. D. California, S. D.   July 6, 1928.

No. 18988.

Insurance ⬉402—Marine policy, covering goods in transit "until safely deposited in * * * warehouse at destination," covered loss in custom house, notwithstanding intended reshipment.

Marine insurance policy, covering goods "from the time of leaving the shippers' or manufacturers' warehouse during the ordinary course of transit until on board the vessel, during transshipment, if any, and from the vessel whilst on quays, wharves, or in sheds during the ordinary course of transit until safely deposited in consignees' or other warehouse at destination named in policy," *held* to cover loss by fire while goods were in custom house at point of destination, though goods were not intended to be warehoused at that point, but were intended to be reshipped as soon as practicable, and risk continued until expiration of 10 days after landing, or until consignee had in some way definitely warehoused, shipped or otherwise appropriated them.

In Admiralty. Libel by Donald Lindo against the Ocean Marine Insurance Company, Limited, and another. Judgment for libelant against the named respondent.

Derby, Single & Sharp and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., for libelant.

W. S. Andrews and Bell & Simmons, all of San Francisco, Cal., for respondents.

KERRIGAN, District Judge. On March 1, 1924, H. M. Newhall & Co., of San Francisco, as agents for respondents, issued to E. Palazio & Co., of Corinto, Nicarauga, an open marine policy on goods shipped by them to various ports, including Guatemala. Palazio & Co. had authority to issue certificates of insurance under this policy. During the same month the firm of Schlubach, Sapper & Co., of Guatemala City, ordered various shipments of cotton from E. Palazio & Co., which resulted in the shipment of 45 bales from Corinto on the 24th of the month by the steamship Eupatoria and 95 bales on April 3, 1924, by the steamship San Juan. These shipments were covered by said policy.

The Eupatoria arrived at San Jose de Guatemala on April 4th, but, the port being too congested to discharge the 45 bales at the time, she proceeded to Champerico, a distance of about 70 miles, returning to San Jose on April 11th, when the 45 bales were discharged, and at least 34 of them were placed in the custom house there. It is con-

tended that the policy was discharged because of the trip to Champerico, but, on reading the certificates of insurance and the open policy together, I am satisfied that this is not the case, and that the goods were covered at the time of their landing at San Jose.

The San Juan arrived in San Jose April 10, 1924, and the 95 bales on board were discharged, these also being placed in the custom house.

On April 16, 1924, before the removal of the goods from the custom house by Schlubach, Sapper & Co., the custom house burned down, and the 192 bales so placed therein were destroyed by fire.

The certificates of insurance recite that they are issued under the open policy of E. Palazio & Co., covering the cotton in question. One of the risks insured against was the risk of fire. The certificates also contain the following clause, on which the main point in the case turns:

"The insured goods are covered, subject to the terms of this policy, from the time of leaving the shippers' or manufacturers' warehouse during the ordinary course of transit until on board the vessel, during transshipment, if any, and from the vessel whilst on quays, wharves, or in sheds during the ordinary course of transit until safely deposited in consignees' or other warehouse at destination named in policy, but in any event risk hereunder to cease within 10 days after landing at destination."

Under the terms of the policies, any loss is payable in San Francisco to Schlubach, Sapper & Co., or order. After the loss of the cotton, Schlubach, Sapper & Co. made proof of loss and indorsed the certificates to libelant, Donald Lindo, and forwarded all documents to him for presentation to H. M. Newhall & Co. This was done, and payment was refused. Suit was then commenced. Respondents urge that the evidence shows that Schlubach, Sapper & Co., and libelant as their assignee, are not entitled to maintain this suit, but examination of the record convinces me to the contrary.

Many points are made, but the most important, and the only one that will be discussed at length in the case, is the meaning and effect of the "warehouse to warehouse" clause, contained both in the open policy issued by respondent Ocean Marine Insurance Company, Limited, to E. Palazio & Co., and in the certificates of insurance thereunder issued by the latter to Schlubach, Sapper & Co. This clause is given in full above.

There is much discussion in the briefs, based on the dictionary definition of the word "warehouse," and relating to the question whether the custom house "bodega," or "warehouse," at San Jose de Guatemala was of sufficiently sturdy construction to be classified as a "warehouse," rather than a "shack" or "shed." I do not doubt that the custom house at San Jose, while far from being fireproof, might, so far as its physical character is concerned, well be used as and called a "warehouse." The real question here, however, is the meaning and effect of the "warehouse to warehouse" clause, and I do not think that it is to be determined by a critical consideration of the meaning of the term "warehouse," and whether a particular custom house building falls within the definition.

Both parties agree that the insurance here involved does not cover beyond San Jose de Guatemala, nor apply to the contemplated transit from there. Both agree that it was "transit insurance"; that is, insurance of the goods only while in transit. The respondents, however, contend this to mean that the risk ends whenever the transit to the port of destination ends by the goods reaching their final resting place at that port. They argue that the goods were here "safely deposited in the consignees' or other warehouse named in the policy," and that whether warehouse or shed is really immaterial, since the goods had reached their final resting place at the port of destination, and were no longer in transit. Respondents say: "If at the port of destination the goods were unloaded from the vessel to a wharf, a quay, or a shed, which is their final resting place, they are no longer covered (although not deposited in 'consignees' or other warehouse') because they are no longer in transit."

Libelant, on the other hand, contends that the "warehouse to warehouse" clause was intended to extend the "transit" during which the goods were insured; that it does not treat the transit as ended upon the mere landing of the goods, but covers them at the port of destination, so long as they are in transit, until they are either safely deposited in "consignees' or other warehouse" there, or 10 days has elapsed since their landing. Libelant argues, further, that where it is intended to ship the goods inland as soon as practicable, and they are held in a custom house to be cleared for less than 10 days, and, for no more than the time reasonably required to release them from the custom authorities, this cannot be regarded as a deposit in "consignees' or other warehouse," within the meaning of the "warehouse to warehouse" clause.

In my opinion the position of libelant is

most nearly in accord with the evident purpose of the "warehouse to warehouse" clause. Until it came into use, marine policies commonly insured goods only until "discharged and safely landed." This terminated the risk immediately the goods were landed, and, unless other insurance was effected, left them uninsured from that time until they could be removed from the wharf and warehoused. The new clause was intended to change this. Its obvious purpose was to extend the period of the risk to cover the "ordinary course of transit," before loading at the port of shipment and after landing at the port of destination, "whilst on quays, wharves, or in sheds during the ordinary course of transit, until safely deposited in consignees' or other warehouse at destination named in the policy, but in any event risk hereunder to cease within 10 days after landing at destination."

This clause might have been more clearly expressed in some respects, but its purpose seems fairly plain. When the intended destination of the goods is that named in the policy, and they are to be warehoused there, the case is simple. It would be conceded in that case that the temporary deposit of the goods by public authorities in a custom house, and their retention there for less than 10 days, if such period was reasonably necessary to clear them through the custom house, would not terminate the risk. The goods would be regarded as still in transit. The holding in the custom house would not be deemed the safe deposit in the "consignees' or other warehouse" referred to in the clause, and the risk would end only upon such deposit, or the earlier expiration of a period of 10 days after landing.

In a case where the intended destination of the goods is not the destination named in the policy, and the consignee does not intend to warehouse them there at all, but intends that they shall be reshipped as soon as practicable, I cannot believe that the operation of the clause is so far affected that the action of the public authorities in taking the goods to a custom house accomplishes the safe deposit in the consignees' or other warehouse referred to therein. In my opinion, the goods are not in such a case "warehoused," within the meaning of the policy, and the risk continues until either the expiration of 10 days after landing or until the consignee has in some way within that period definitely warehoused, shipped, or otherwise appropriated the goods at the destination named in the policy.

The construction of the clause contended for by respondents would mean that, if a consignee intended to warehouse the goods at the destination named in the policy, the risk would continue until he did so, or 10 days expired after their landing. But, if the consignee did not intend to warehouse them there, but to transport them further, the risk would cease the moment they were landed at such intermediate point. With this view I cannot agree.

Toward the end of the case, if not earlier, it was learned that the open policy issued to Palazio & Co. ran only from the Ocean Marine Insurance Company, Limited, whereupon libelant discontinued the suit against respondent North British & Mercantile Insurance Company, Limited. The latter company, therefore, should have its decree, with costs.

The amount of damages suffered, if libelant is entitled to recover, is not, it appears, disputed. Therefore judgment will be ordered entered for libelant in the sum of $18,-220, with interest from April 16, 1924, and costs, and in favor of respondent North British & Mercantile Insurance Company, Limited, against libelant for its costs.