CONTINEX, Inc. v. THE FLYING INDE-PENDENT et al.

United States District Court
S. D. New York.
July 28, 1952.

Hill, Rivkins & Middleton, New York City, proctors for libelant. Arthur O. Louis, Barton P. Ferris, New York City, advocates.

Lord, Day & Lord, New York City, proctors for respondent. John R. Mahoney, New York City, advocate.

## McGOHEY, District Judge.

Libelant sues to recover damages to four shipments comprising 150 steel envelopes containing hot rolled close annealed mild steel sheets.

Admiralty jurisdiction of the Court was conceded by the respondent Isbrandtsen against which the suit proceeded in personam. Jurisdiction was never acquired over the vessel.

Libelant is a New York corporation. Respondent, a New York corporation, is a common carrier of merchandise by water for hire. Between December 29, 1948, and January 21, 1949, it owned, operated and controlled the S. S. Flying Independent, a general ship engaged in the common carriage of merchandise by water for hire.

On December 29, 1948, at Antwerp, the respondent Isbrandtsen issued four bills of lading. These admit receipt on board the S. S. Flying Independent in "apparent good order and condition" of four shipments consisting of 150 "steel envelopes containing hot rolled close annealed mild steel sheets" as follows:

Shipment A — 50 envelopes of 12 gauge sheets
" B — 45 " " 18 " "
" C — 50 " " 24 " "
" D — 5 " " 20 " "

The envelopes were 8 feet long by 3½ feet wide. They were about 4 inches thick and each contained about 40 sheets of steel. The envelopes consisted of "waster" steel sheets and were bound around by four steel straps, one lengthwise and three crosswise. This was the regular and customary kind of packing for such steel sheets. The consignee in each of the bills was the Bank of London and South America, Ltd., New York, which had issued and delivered to the seller for account of libelant an irrevocable letter of credit for $26,160. Payment under the letter of credit required presentation, among other documents, of "clean on board Bills of Lading" evidencing the shipments above described.

The chief mate who supervised the loading at Antwerp on December 29, 1948, noted on his receipts for three of the shipments "Covers buckled slightly rusty", and on the fourth "Covers buckled." On the same day, respondent's agent in Antwerp received from the shipper, in consideration for signing "clean bills" on each of the four shipments, four letters of indemnity "from all consequences which may arise from the non-insertion on your part" of the above notations in the bills of lading. There was also a commitment to refund any money paid by the respondent on any claim arising from the omission of the foregoing notations.

Prior to arrival of the shipments in New York in very badly damaged condition, the seller presented its draft accompanied by the documents including the clean bills of lading as called for in the letter of credit, and the draft was honored. When unloaded at New York the four shipments were found to have the steel straps and envelopes torn, some completely off, contents exposed and rusted, the sheets buckled and damaged at the edges. Some bundles were bent into an U shape and all were permanently deformed. The damaged edges had to be cut off and disposed of as waste.

The envelopes when loaded were stowed in the forward wings of the number two lower hold. Although the chief mate, who was in charge of the loading, said he preferred the square of the hatch for the stowage of steel sheets such as these, that area was not then available because it was already occupied by tanks and tank turrets previously taken aboard. The loading was done by the ship's gear from lighters to the hold through the hatch which was about 20 feet by 30 feet. The envelopes were then dragged for about 20 feet along the deck over dunnage, past steel posts and the tanks to the wings, and there stowed one on top of another with dunnage between. On top of the envelopes were stowed steel plates

and aluminum ingots as well as bales of cotton linters. Some of the latter were also placed around the stacked envelopes. The libelant's expert agreed with the mate that the better practice in stowing steel sheets such as these is to stow them in the square of the hatch if possible. He added, however, that if they are stowed in the wings they should not be dragged along the deck as the mate had described, but should be moved on rollers. I accept this testimony. The mate, in rebuttal, changed his prior testimony to say that rollers had in fact been used. I do not accept his later version.

The vessel left Antwerp on December 31, 1948, and arrived at New York on January 21, 1949, having previously discharged cargo at Baltimore. While at the latter port, the chief mate observed that the stow of which these shipments were a part showed no signs of having shifted or changed during the voyage. He was not on hand when they were discharged at New York. Respondent offered no testimony as to how this was done, or as to what, if anything, happened to the cargo during discharge.

■ When a carrier issues a clean bill of lading for goods manifestly damaged he is estopped to deny the assertion against a purchaser of the bill of lading who has been misled to his damage by reliance on the representation.[1] But the misrepresentation must relate to the damage. In The Carso,[2] the Court found that the stains on some of the containers did not indicate the real damage which was the almost complete loss of butter fat due to the presence of skippers in the cheese. Consequently it held that the clean bill, though false, did not create an estoppel because the misrepresentation was unconnected with the damage.

■ It is argued that the situation here is the same, i. e. that mere rusty and buckled covers did not indicate the real damage to the steel sheets contained therein, and so the misrepresentation was unconnected with the damage. But the underlying assumption of that argument defeats its purpose. While loss of butter fat due to skippers was not disclosed by the stains on the containers of cheese, the kind of damage found in this case and which respondent's argument assumes existed at the time of delivery to the vessel must have been apparent to the mate despite his ambiguous notations on the receipts. It is true he testified that these envelopes on delivery were in no worse condition than those he had carried on many previous occasions. But I cannot believe that if that were so and if the envelopes here were in ordinary normal condition, the respondent would have deemed it necessary to require letters of indemnity as a condition of issuing clean bills.[3] But it did, and this fact seems to me strongly to support, if indeed it does not compel, the inference that these sheets on delivery to the vessel were already damaged. The respondent, therefore, would be estopped to contradict the representation in its bill of lading. But, even if the mate's notation be understood as meaning only that the covers alone were rusty and buckled, and even if it be accepted, as urged, that the letters of indemnity were required merely out of an excess of caution, the respondent is no better off. The proof showed that on arrival at New York the cargo was far more seriously damaged than the mate's notation thus understood described. It further showed that the damage was caused by rough handling and that the envelopes had been handled roughly, during the loading certainly, and probably during the unloading as well. Thus on the record I think the libelant clearly made a prima facie case. This indeed is not seriously disputed, and the respondent relies for exoneration on two exceptions in the bill of lading, namely, perils of the sea and insufficiency of packing.

■■ In The Carso, the respondent was not permitted to invoke the bill of lading exceptions relieving it from damage arising from vermin, leakage, wastage or decay, or from heating, because "these things were all promoted by the condition of the cheese which it has said did not exist." It was

1. Oliver Straw Goods Corp. v. Osaka Shosen Kaisha, 2 Cir., 27 F.2d 129, 133.

2. 2 Cir., 53 F.2d 374, 376.
3. Cf. 53 F.2d at page 377, 379.

suggested by libelant that this ruling and reasoning precluded the respondent here from availing itself of any exceptions in the bill of lading, and particularly those of perils of the sea and insufficiency of packing. As to the latter exception I would agree in view of the mate's notation. However, I think it makes no difference whether that exception be allowed here or not, because the proof clearly showed that the packing was such as is customarily used.

I am less sure that the exception for damage due to perils of the sea may be denied to the respondent, and so I resolved the doubt in its favor and received its evidence on the point. However, it has failed to sustain its burden of proof to bring the loss within the exception.[4] The proof as to weather was as follows:

At times during the first three days out of Antwerp the vessel encountered some strong winds and heavy seas. The wind registered 8 on the Beaufort scale about midnight on December 31. By 4:00 A. M. on January 1, it had increased to 10. Then it dropped to 8 and rose again to 10 at 5:00 P. M. It dropped to 5 by midnight of the 1st and remained at 5 or 6 throughout the 2nd, except for a short period about 4:00 P. M. when it reached 9. On the 3d it was generally at 6, and on the 4th generally at 4 or 5. The vessel took some heavy seas forward which swept some deck cargo over and tore off one lifeboat cover, but no water got into the number two lower hold where this cargo was stowed. The chief mate said the weather was no different than he had experienced more times than he could recall.

Thus it appears that the weather was no worse than was "to be expected in such waters at such a season"[5] and did not constitute a peril of the sea "within the rather factual standard of the cases."[6] It is clear, moveover, that the weather, however severe, did not affect this cargo. No water got to it and, according to the chief mate, it was not disturbed or shifted when he checked it at Baltimore.

Accordingly, a decree for the libelant to be settled on notice may be entered. It will provide for a reference to a Commissioner of the question of damages, unless this is stipulated.

Submit suggested findings and conclusions with proposed decree.

---

4. Edmond Weil, Inc., v. American West African Line, Inc., 2 Cir., 147 F.2d 363, 366.

5. 147 F.2d at page 366.

6. Ore Steamship Corporation v. D/S A/S Hassel, 2 Cir., 137 F.2d 326, 328.