Sidney J. GROBAN et al., and Union Tractor, Ltd., Plaintiffs,

v.

S.S. PEGU, her engines, etc. and Elder Dempster Lines, Ltd., Defendants.

Sidney J. GROBAN et al. d/b/a Groban Supply Company, and Union Tractor, Ltd., Plaintiffs,

v.

AMERICAN CASUALTY COMPANY, Defendant.

Nos. 63 Ad 516, 63 Civ. 1030.

United States District Court, S. D. New York.

July 23, 1971.

Hill, Betts, Yamaoka, Freehill & Long-
cope, New York City, for plaintiff Sid-

ney J. Groban by Eli Ellis, New York City.

Hill, Rivkins, Warburton, McGowan & Carey, New York City, for Union Tractor Ltd. by Clare Walker, New York City; Lord, Bissell & Brook by William K. Johnson, Chicago, Ill., of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendants S. S. Pegu and Elder Dempster Lines, Ltd. by John H. Cleveland III, John de Peyster Douw, New York City.

Bigham, Englar, Jones & Houston, New York City, for American Cas. Co. by Joseph J. Magrath, 3rd, New York City.

## OPINION

FREDERICK vanPELT BRYAN, District Judge:

These two actions, consolidated for purposes of trial, were tried before me without a jury. Both concern an inventory of Caterpillar tractor parts purchased from the Sierra Leone Development Company, Ltd. (SLDC), a British corporation, consigned aboard the S. S. Pegu to Groban Supply Company (Groban), an Illinois partnership,[1] at the Port of New York.

One of the actions is a suit in admiralty by Groban and Union Tractor Ltd. (Union), a Canadian corporation with principal offices in Edmonton, Alberta, against the S. S. Pegu (Pegu) and its owner and operator Elder Dempster Lines, Ltd. (Elder Dempster), a British corporation, alleging that plaintiffs relied to their detriment on a misdescription of the shipment of the tractor parts in a bill of lading issued by the Pegu at Freetown, Sierra Leone. The other is a diversity action by Groban and Union to recover for damages to the goods upon a marine open cargo policy, allegedly covering the shipment, issued by defendant American Casualty Company (American), a Pennsylvania corporation.

## I.

### Basic Facts

In June 1961, Groban contracted to purchase an inventory of Caterpillar tractor parts, located in Sierra Leone, West Africa, from SLDC at a price to be agreed upon. Before that purchase was concluded, Groban contracted to resell the inventory to Union. As part of its transaction with Union, Groban, at Union's request,[2] agreed to obtain marine and war risk insurance on the shipment at Union's expense. At that time Groban was the assured under a marine open cargo policy of insurance issued by defendant American in 1958. Under the terms of the policy, Groban, as assured, was permitted to insure shipments for its own account and for the accounts of others from whom written instructions to insure had been received prior to known or reported loss. Groban was also authorized to issue certificates or special policies of insurance on forms furnished by American for any and all shipments with respect to which insurance was provided under the open cargo policy.

When Groban contracted to purchase the tractor parts inventory it was stored at Marampa Mines, some 90 miles from the port of Freetown, Sierra Leone. The inventory was sold, subject to inspection in New York to insure that the goods were free of defect or damage. The parts were represented by the seller to be genuine Caterpillar spare parts in unused condition.

While at Marampa Mines, the inventory was stored indoors. Smaller parts were stored in bins and the larger parts on the floor. Those which had been packaged in cartons by the manufacturer were stored in that condition. The inventory

---

1. Plaintiff Groban Supply Company, Inc., a Delaware corporation with its principal place of business in Chicago, is the successor in interest to the Groban Supply Company partnership.

2. The request was made in the Purchase Order dated June 15, 1961 and in a telegram dated June 19, 1961.

was periodically inspected for condition and oiled and greased from time to time. None of the parts had been used.

After SLDC contracted to sell the parts to Groban, they were packed for ocean shipment and were given yard storage at Marampa Mines, under tarpaulin in good condition, protected from the elements.

In late August, 1961, the goods left Marampa Mines destined for Groban in the United States. At that time the parts were dry and not rusty. Prior to transit, the cases and other shipping units had been marked "Groban", with the destination port. The inventory was transported from Marampa Mines to Freetown by rail and lighter in early September, 1961, and remained there for some six weeks until shipped aboard the Pegu, a general merchant ship engaged in the common carriage of goods. In Freetown the goods were stored on an open quay owned and controlled by the Freetown Port Management, an independent governmental authority. During this time the tractor parts were left uncovered and exposed to frequent and heavy tropical rains. Employees of SLDC who recoopered and repacked some of the shipping cartons which had been damaged in transit observed that the contents of the cases had become wet and some of the parts were rusty.

Although the shipment had been booked by Groban with Elder Dempster for shipment aboard the first available vessel, the goods were not loaded aboard the Pegu bound for the port of New York until October 24, 1961. Groban was not responsible for the delay that occurred in Freetown.

The Pegu loaded the inventory from lighters owned by the Freetown Port Authority. A claused bill of lading was issued by the Pegu stating, among other things:

Cargo loaded in second hand condition 12 Case [sic] loaded broken

\* \* \* \* \* \*

During loading the exposed items in the shipment were found to be rusty; the shipping crates, heavily weather stained. The straw and packing materials inside some of the wooden packing cases which had broken open were wet and soggy and the contents showed rust.

Prior to the shipment from Freetown, Groban had sent SLDC a letter of credit conditioned, among other things, upon the furnishing of a full set of on board clean bills of lading to accompany seller's draft. After the goods had been shipped from Freetown but prior to arrival in New York, SLDC negotiated the draft accompanied by various instruments. However, instead of the clean bills specified in the letter of credit, SLDC tendered the claused bills of lading issued by the Pegu and also tendered an indemnity agreement of its bank issued because the bill of lading was claused and not clean. These documents were accepted and Groban paid $13,373.25, the amount of the draft when presented. A copy of the claused bill of lading had been sent to Groban by SLDC from England, about November 1, 1961, and was received by Groban in Chicago within the next few days.

The Pegu arrived in New York on November 10, 1961 and completed discharge on or about November 13. Following discharge, the shipment of tractor parts was inspected by surveyors appointed by defendants American and Elder and by representatives of the plaintiffs. After representative packing cases had been opened packing materials were found to be wet and deteriorated and the parts extensively and severely rusted. The rust, although of relatively recent origin, was not due to exposure to salt water. It was caused by fresh water wetting as a result of exposure to the elements for a considerable period of time. The rust damage found on outturn in New York was the result of exposure to heavy and frequent rainfall during open and unprotected storage on the Port Management quay at Freetown.

On or about November 17, 1961 Groban prepared a declaration of the shipment under the marine open cargo policy. The

declaration, dated August 15, 1961, recited insurance coverage on 283 packages of new Caterpillar tractor parts aboard the Pegu from Freetown to New York, valued at $48,000 plus 10%, with loss payable to Groban and Union or order. The declaration was on the standard all-risk form supplied by American. Groban simultaneously issued a special marine policy covering Union's interest in the shipment, as it was authorized to do under the Policy terms. The special marine policy was on the all-risk form of American and was in terms identical to the declaration. The coverage in favor of Union was pursuant to Union's pre-shipment request to Groban made the previous June.

Copies of the declaration and special policy of insurance issued by Groban were sent to American on November 28, 1961 and received on or about December 1, 1961. American rejected the declaration and special policy solely on the ground that the tractor parts which Groban had purchased from SLDC were not new parts, as stated in these documents, but were surplus parts. American therefore took the position that the shipment should have been declared and valued as a shipment of surplus parts. Under the American policy, the coverage for new goods was considerably broader and more comprehensive than for surplus merchandise, both as to perils covered and as to quantum of loss.

After the inspection in New York by representatives of the parties, the goods were shipped on to Union at Edmonton, Alberta, without prejudice to the rights of any of the parties in interest. When the goods arrived there, they were found to have been damaged to the extent of 73%. As between Groban and Union and American, the parties have stipulated, without conceding liability, the amount of damage in the alternative, depending on whether the insured value should be based on Groban's cost or on Union's cost, a point at issue between these parties. Damages have not been stipulated as between plaintiffs and Elder Dempster.

## II.

### The Claim Against the Pegu and Elder Dempster

There is no evidence that the extensive and severe rust damage to the tractor parts and the wetness of the cases and materials in which they were packed occurred while the goods were aboard the Pegu, or were brought about by any fault of the vessel. Plaintiffs concede that the rust was fresh water, not salt water damage. The cause of the damage was the exposure of the goods to heavy tropical rains on the quay at Freetown before they were loaded aboard the Pegu. Groban does not now make any serious claim to the contrary.

Groban now asserts that the condition of the goods was known to the officers of the Pegu and the agents of Elder Dempster when the goods were loaded aboard the vessel at Freetown and the bills of lading were issued; that the bills of lading issued misdescribed the condition of the goods by failing to state that they were rusted and packed in wet materials and that Groban was misled thereby to its detriment when it concluded the purchase from SLDC while the shipment was en route to New York.

The bills of lading recited that the goods were "shipped in apparent good order and condition, except as noted below." The following exceptions were noted:

Cargo loaded in Second hand condition

12 Case [sic] loaded broken

11 C/S less in dispute by ship's tally if on board to be delivered.

2 Bdles more in dispute by ship's tally if on board to be delivered.

Groban's theory is that Elder Dempster is estopped from showing that the shipment was received aboard the Pegu in substantially the same rusty and wet condition found at outturn because Groban, in reliance upon misdescription of the condition of the goods in the bill of lading, made payment therefor, while

the shipment was en route from Freetown to New York.

A party claiming such an estoppel has the burden of establishing that he acted to his detriment in reliance on misstatements as to the condition of the goods in the bill of lading. *E.g.*, Freedman v. The Concordia Star, 250 F.2d 867, 869 n. 2 (2d Cir. 1958); The Carso, 43 F.2d 736 (S.D.N.Y.1930), *rev'd in part*, 53 F.2d 374 (2d Cir.), *cert. denied*, Navigazione Libera Triestina v. Molinelli, Giannusa & Rao, Inc., 284 U.S. 679, 52 S.Ct. 140, 76 L.Ed. 574 (1931). See United States for Use and Benefit of Hyland Electrical Supply Co. v. Franchi Bros. Construction Corp., 378 F.2d 134 (2d Cir. 1967). Groban has failed to meet that burden and indeed the evidence is to the contrary.

Payment for the goods was to be made by a letter of credit opened by Groban in favor of the seller, SLDC. Groban's instructions to its bank were that the credit was to be payable only upon the furnishing of on-board clean bills of lading to accompany seller's draft. The letter of credit so provided.

On or about November 3, 1961, SLDC presented a seller's draft against the letter of credit to the Midland Bank in London, accompanied by the claused bill of lading issued by the Pegu, containing the exceptions above noted, and also gave a guarantee valid for six months on account of the clausing of the bill of lading. Instead of insisting upon a clean bill of lading as required by the letter of credit, Groban's negotiating bank accepted the claused bill with the noted exceptions and the accompanying guarantee and paid the draft on that basis.

A copy of the claused bill of lading with the noted exceptions was sent to Groban on November 1, 1961 and received in Chicago a few days thereafter. At the trial, Groban laid emphasis on the fact that it understood it was buying new tractor parts from SLDC. Groban's president testified that he did not consider the claused bill of lading which was presented a clean bill of lading, that if he wanted to buy new goods he would not have purchased the claused bill as representing new goods; and that he would not, in a purchase of new goods, rely upon it. On November 14, 1961 Groban notified its bankers, First National Bank in Chicago, that it would hold the Midland Bank in England to its firm guarantee issued because of the clausing in the bills of lading. Groban made no real effort to enforce that guarantee. However, apparently alerted by the exceptions noted in the bill, Groban made a claim against the insurer of the shipment prior to the arrival of the Pegu in New York.

On this evidence, it is apparent that Groban did not part with anything of value or act to its detriment in reliance on a misdescription of the condition of the goods in the bill of lading. Whether or not the exceptions described with sufficient accuracy the condition of the goods when they were loaded aboard the Pegu at Freetown, the bill issued was not a clean bill of lading and did not comply with the conditions of the letter of credit. Plainly, Groban's bank, and the Midland Bank, which negotiated the draft, and the seller must have been quite aware, from the exceptions in the bill, that the bills did not comply with the conditions of the letter of credit, and were entitled to reject the draft. Otherwise, the guarantee on account of the claused bill would never have been tendered or accepted.

Since reliance to its detriment on the alleged misdescription of the goods in the bill has not been established, Groban cannot recover damages against the Pegu and its owner based on misdescription.[3]

■ Beyond this, it cannot be said that, under the facts and circumstances here, the exception in the bill of lading

---

3. The time bar defense raised by Elder Dempster does not bar this action. It is apparent that agents of the defendants Elder Dempster and the Pegu extended the time in which the action could be brought and this extension ran to the claim, and not to individual defendants.

constituted a misdescription of the condition of the goods as received aboard the Pegu for which the carrier is liable. The phrase "cargo loaded in secondhand condition" plainly covered a multitude of sins. In terms of the "new" parts which Groban insists it purchased, and on the basis of which it seeks to hold its insurer, American, the exceptions in the bill were broad enough to indicate that the goods were not what Groban had agreed to purchase. Plainly, the carrier was under no obligation to detail the specific reasons why the goods were considered to be in second hand condition, for the exceptions noted on the bills here sufficiently covered the kind of damage alleged. See S. M. Wolff Co. v. The S. S. Exiria, 200 F.Supp. 809, 811 (S.D.N.Y.1961). A reasonable purchaser, who should have been and no doubt was aware of the conditions and possibilities affecting such a shipment as this, could be reasonably expected to be put on notice by the exception clause that wetting and consequent rust may well have been the reason why the goods were described as "in secondhand condition".

While the officers of the Pegu might have stated more fully the condition of the goods, they could scarcely be expected to be expert in describing the condition of a shipment of tractor parts such as this. The bill which they prepared was claused to indicate the condition of the goods as it reasonably appeared to them. Groban had anticipated a shipment of new parts and no reasonable reading of the claused bill could help but dispel this expectation. Groban's real complaint is that the descriptive language of the exceptions is overly broad, rather than too narrow. Surely, Groban cannot complain that it was not put on notice that the goods were not as represented by the seller, because the exception was broad enough to include a variety of defects in the shipment without specifying or particularizing them in any great detail.

None of the cases relied upon by Groban hold to the contrary. Most of them deal with clean bills of lading issued for goods which were defective on their face

when loaded. See, e. g., Freedman v. The Concordia Star, 250 F.2d 867 (2d Cir. 1958); Continex, Inc. v. The Flying Independent, 106 F.Supp. 319 (S.D.N.Y. 1952). In some of these cases the carrier either had a corrupt arrangement with or was induced by the shipper to issue a clean bill when the facts were to the contrary. Empresa Central Mer. De Rep., Ltda v. Republic of the U. S. of Brazil, 257 F.2d 747 (2d Cir. 1958); Higgins v. Anglo-Algerian S. S. Co., 248 F. 386 (2d Cir. 1918); Baltic Cotton Co. v. United States, 50 F.2d 257 (S.D.Ala. 1931). None of these cases held that a carrier should be held liable for misdescription in the bill of lading where, as here, the exceptions noted are broad enough to cover the defects which appeared.

■ All that the carrier is required to do is to use such language by way of exception in the bill of lading as will reasonably indicate to the consignee in general terms the condition of the shipment in the light of all the facts and circumstances. Karabagui v. The Shickshinny, 123 F.Supp. 99, 103 (S.D.N.Y.1954), aff'd, sub nom. Kupfermann v. United States, 227 F.2d 348 (2d Cir. 1955). See S. M. Wolff Co. v. The S. S. Exiria, 200 F.Supp. 809 (S.D.N.Y.1961). The exceptions noted here were quite sufficient to conform to that standard and plaintiffs' unclaused bill cases do not dictate a contrary result. See Copco Steel & Eng. Co. v. The Prins Willem Van Oranje, 159 F. Supp. 79 (E.D.Mich.1957); Copco Steel & Eng. Co. v. S/S Alwaki, 131 F.Supp. 332 (S.D.N.Y.1955).

Plaintiffs are, therefore, not entitled to recover against Elder-Dempster and the Pegu and judgment will be entered in favor of these defendants and against plaintiffs Groban and Union with costs.

## III.

### The Claim Against American Casualty Company

■ Plaintiffs claim that American is liable to them in the sum of $42,970.89 for damage to the shipment of tractor

parts purchased by Groban from SLDC and resold by Groban to Union under the terms of the Open Marine Cargo Policy issued by American in Groban's favor and the declaration and special policy issued by Groban pursuant to the open policy covering the interest of both plaintiffs in the shipment.

The declaration described the shipment as "new Caterpillar Tractor parts" shipped by the Pegu from Freetown, Sierra Leone, to New York. The declaration and special policy valued the shipment at $48,000, the amount of the resale price from Groban to Union, plus 10%, or a total of $52,800, with loss payable to Groban and Union or order.

American contends it has no liability to the plaintiffs under its policy on the following grounds:

(1) The shipment of tractor parts was a shipment of "surplus" goods and not of "new" goods. Thus the damage complained of did not fall within the broad, all-risk coverage provided by the policy for "new" goods, and was not within the limited coverage provided for "surplus" goods.

(2) The insurance did not attach until the goods entered transit from Freetown to New York and therefore the damage complained of which occurred prior to shipment from Freetown was not covered.

American also attempts to imply that neither Groban nor Union had an insurable interest in the shipment at the time the damage occurred and maintains that, in any event, Union acquired no rights under the policy and is not entitled to sue thereon and that recovery may not be based on a valuation of $48,000, the purchase price on the sale from Groban to Union, but only on a valuation of $19,231, the purchase price on the sale from SLDC to Groban.

These various contentions will be discussed seriatim:

### A.

Under the terms of the open policy, shipments of "new and/or rebuilt merchandise, parts and accessories" were insured against all risks of physical loss or damage from any external cause. Such shipments were to be valued at invoice value, plus all charges, plus 10%.

Shipments of "used and/or surplus merchandise, parts and accessories", on the other hand, were entitled to limited coverage only, and it is conceded by plaintiffs that if this was a shipment of "used" or "surplus" tractor parts, the damage was not covered by the policy.

The declaration Groban filed with American described the goods as "283 PACKAGES, 66 TONS, NEW CATERPILLAR TRACTOR PARTS." The declaration was rejected by American on the sole ground that the tractor parts were not "new" parts but were "surplus" parts, within the meaning of the policy, and that the shipment should, accordingly, have been so described and valued.

Neither the term "new" nor the term "surplus" is defined in the policy. These terms must be given the meaning that a reasonable person in the position of the assured would have understood them to have, not what the insurer would like to have them mean, Hoffman v. Illinois National Casualty Co., 159 F.2d 564, 566 (7th Cir. 1947), and if there is ambiguity in the meaning of the terms it must be resolved in favor of the assured. See, e. g., Rosa v. Insurance Co. of Pennsylvania, 296 F.Supp. 167, 172 (S.D.Calif. 1969), aff'd, 421 F.2d 390 (9th Cir. 1970).

The evidence clearly establishes that the inventory of tractor parts purchased by Groban from SLDC and resold by Groban to Union were "new" parts and not "surplus" parts, as these terms were generally understood in the machinery trade, by Groban, Union and SLDC, and within the meaning of the policy.

Dinn, of Power Components, Ltd., Groban's London agent, who negotiated the sale, testified that he understood from SLDC that the inventory which was the subject of the sale consisted of new and unused Caterpillar tractor parts in original factory cartons. Raymond Groban testified that Dinn so informed him, that

he purchased the inventory on that basis, and that he so described the inventory to Union on the resale transaction. Seadon, Union's president, testified that he purchased the inventory from Groban upon the understanding that it consisted of new Caterpillar parts in factory wrappings.

Before the sale to Groban was closed, SLDC confirmed in writing that "all these parts are genuine caterpillar spares and are in an unused condition." They were to be free from defect and damage. After the loss, SLDC advised Groban that "the goods were new and unused when delivered at dockside."

According to the testimony of Dinn, Groban and Seadon, all of whom were experienced in the tractor and tractor parts business, it was well understood in the trade that the term "new" meant "unused and free of defects." Most of the parts had been kept in factory wrappings at Marampa Mines, with the exception of some large items which may not have been factory wrapped in the first place, and had been properly stored and cared for while at Marampa. The parts were still in such wrappings at outturn in New York. There is sufficient evidence to show that this Caterpillar parts shipment, when it left Marampa, was a shipment of new parts within the general understanding of that term in the trade.

All of the evidence concerning the meaning of the term "new" and that the goods were in fact new is uncontradicted. American contends, however, that the testimony of plaintiff's witnesses, and particularly that a Raymond Groban, was unworthy of belief and should be disregarded. The sweeping attack made by American on Groban and other plaintiffs' witnesses lacks any substantial support on the record and is rejected. No good reason has been advanced why the term "new" as used in the policy should be given any different meaning from that generally understood in the trade. If the insurer intended a different meaning, it was under obligation to say so in the policy.

Defendant's argument that this was not "new" but was "surplus" merchandise within the meaning of the policy is unconvincing. It is based in substantial measure on the premise that there was no showing as to when the parts comprising the shipment were manufactured or left the factory. There is no support in the policy or in the record for the premise that because considerable time might have elapsed between the time the goods left the factory and the time they were purchased by Groban, they were no longer new. Indeed, the only cases called to my attention dealing with the subject hold to the contrary. See Ajax Petroleum Products v. Blake, 126 N.E.2d 926 (Ohio App.1953); Baum v. Segal, 89 F. Supp. 716 (D.N.J.1950); Relyea v. Pacific Fire Insurance Company, 124 Conn. 654, 2 A.2d 377 (1938).

There is ample evidence to sustain plaintiffs' claim that this shipment was properly declared under the policy as consisting of "new" parts. On the other hand, "surplus" remains undefined and American has shown nothing to indicate that these parts were "surplus" merchandise and should have been so described in the declaration.

B.

The declaration and special policy issued by Groban described the shipment as from Freetown to New York. American takes the position that the damage to the goods occurred before the shipment left Freetown, and prior to when risk attached under the policy and that therefore the damage was not covered.

Plaintiffs, on the other hand, contend that under the Marine Extension Clauses (M.E.C.) of the policy Groban had the right to declare the goods for warehouse-to-warehouse coverage from point of origin to point of destination; that the plaintiffs intended that the goods should be so covered; that the failure to declare the shipment as one from Marampa Mines to New York, which in fact it was, was due to the understanding that the goods when purchased were at Freetown

and that the shipment was to be from there to New York; that this inadvertent error or mistake was due to no fault of their own and was not discovered until after the commencement of the action; that they have the right to correct such an error so as to reflect the actual facts as to the shipment under the specific terms of the policy; and that in the event they so notify the insurer the loss is held covered.

The policy covered voyages "at and from ports and/or places in the world to ports and/or places in the world." Under the M.E.C., the insurance was to attach,

[F]rom the time the goods leave the warehouse at the place named in the policy, certificate or declaration for the commencement of the transit and continues until the goods are delivered to the Consignees' or other final warehouse at the destination named in the policy, certificate or declaration. In the course of this transit the goods are covered during

(i) deviation, delay beyond the control of the Assured, forced discharge, reshipment and transhipment * * *.

The M.E.C. provisions further provided that shipments were "held covered at a premium to be arranged in case of * * any omission or error in the description of the interest vessel or voyage." [4]

■ The questions of whether Groban is bound by an erroneous statement in the declaration and special policy and whether the shipment was at risk under the policy, are questions of fact to be determined from all the circumstances in the case. Lindo v. Ocean Marine Ins. Co., 27 F.2d 956 (D.C.N.D.Calif.1928), aff'd, 30 F.2d 782 (9th Cir. 1929). See Hillcrea Export & Import Co. v. Universal Ins. Co., 110 F.Supp. 204 (S.D.N.Y.1953), aff'd 212 F.2d 206 (2d Cir.), cert. denied, 348 U.S. 834, 75 S.Ct. 57, 99 L.Ed. 657 (1954).

■ If the assured intended that the transit from the interior of a country to its port be covered by the M.E.C. clauses, risk attaches prior to arrival at the port or loading aboard ship. See Bluefields Fruit & S. S. Co. v. Western Assur. Co., 265 F. 221 (5th Cir.), cert. denied, 254 U.S. 640, 41 S.Ct. 13, 65 L. Ed. 452 (1920); Hillcrea Export & Import Co. v. Universal Ins. Co., 110 F. Supp. 204 (S.D.N.Y.1953), aff'd, 212 F.2d 206 (2d Cir.), cert. denied, 348 U.S. 834, 75 S.Ct. 57, 99 L.Ed. 657 (1954). See also Greene v. Cheetham, 293 F.2d 933 (2d Cir. 1961).

The evidence here establishes that Groban's purpose and intent was to insure the shipment commencing from the point of origin to the ultimate destination.

At the time the contract with SLDC was negotiated, Groban and its representative were mistaken in believing that the goods were in Freetown. In fact, at that time and also when the inventory was resold, when written instructions were received from Union to insure, and when Groban in accordance with its usual procedure under the policy of insuring on a warehouse-to-warehouse basis gave instructions to issue the declaration and special policy, the inventory was at Marampa Mines. It is uncontroverted that neither of the plaintiffs learned of this until after American had rejected the claim upon the sole ground that the goods were misdeclared as new and this suit had been commenced. Obviously, it was Groban's intention and purpose to have the shipment covered from point of origin and but for a good faith mistake of fact, it would have so declared the goods.

The inventory left Marampa Mines crated and labelled for delivery to Groban, at a United States Port. I find that

---

4. The M.E.C. provide much broader coverage than the standard attachment and warehouse-to-warehouse clauses in the body of the open policy which they supplant. See Industrial Waxes v. Brown, 258 F.2d 800 (2d Cir. 1958), cert. denied, 358 U.S. 931, 79 S.Ct. 319, 3 L.Ed.2d 304 (1959). See also, Winter, Marine Insurance 162–168 (2d ed. 1952).

this was a single shipment by SLDC to Groban, with its origin at Marampa Mines and its destination New York. The storage on the Port Authority Pier at Freetown was merely an interruption in transit. I find further that the considerable delay incurred while the shipment remained on the Freetown pier awaiting loading aboard ship for the next stage of the transit was not due to any fault of Groban and was a delay in the course of transit beyond Groban's control.

■ The shipment while at Marampa Mines had been completely segregated and otherwise made ready for through shipment to New York and when it left Marampa Mines it left the warehouse there, and was subject to coverage under the policy. See Hillcrea Export & Import Co. v. Universal Insurance Co., 110 F.Supp. at 206–208. Thus even though the transit was interrupted, the goods remained covered by the M.E.C. provisions. See Kessler Export Corp. v. Reliance Ins. Co., 207 F.Supp. 355 (E.D. N.Y.), aff'd, 310 F.2d 936 (2d Cir. 1962).

The damage here occurred after the shipment left Marampa and while it was on the open Port Authority pier at Freetown.

Under the M.E.C. provisions there is no question that Groban, had it been correctly informed, could have declared the shipment from Marampa Mines. Plainly, the policy contemplated that errors in description of the voyage were subject to correction for the M.E.C. clauses provide that the goods are held covered at a premium to be arranged in case of any omission or error in the description of the voyage and presumably such correction could be made by the assured when the error was discovered. The insurer, in turn, was protected in the event of such correction of error by being able to adjust its premium accordingly.

■ Here no premium on the shipment was ever fixed or arranged by American and American has made no claim therefor. American does not claim, nor has it attempted to show, that the premium on a shipment from Marampa to New York was any different from or higher than that on a shipment from Freetown to New York. Nor has American shown that it would be in any way prejudiced by allowing the correction of the error made by the assured in declaring the shipment from Freetown instead of Marampa. Thus the mistake on the face of the declaration will not control. Greene v. Cheetham, 293 F.2d 933 (2d Cir. 1961), on remand, 1963 A.M.C. 123 (S.D.N.Y.1962), aff'd per curiam, 316 F.2d 730 (2d Cir. 1963).

In the first Greene appeal, one of the principal questions was whether an assured under an open policy whose declaration of coverage stated that the shipments were from designated ports in England to destinations in the United States was entitled to coverage for an overland transportation leg in England prior to delivery to the English ports named. The Court of Appeals, while stating that "ordinarily the more specific declaration of coverage would be binding * * * particularly when, as here, the assured may delineate the extent of his own coverage," nevertheless held that extrinsic evidence of purpose and intent should have been admitted to aid in determining when coverage should attach. It noted that, "[o]f course, the amount of the premium paid by the insured could shed light on the parties' intent." 293 F.2d 937, n. 4. The case was remanded to the District Court for the purpose of taking evidence as to the intent and purpose of the assured.

On remand, Judge Weinfeld, after taking such evidence, found that the purpose and intent of the assured was to insure the shipments commencing from the points of origin in England to the points of destination in the United States. He held that under such circumstances the purpose and intent of the assured controlled and that therefore the overland transportation leg in England was covered despite the fact that the declaration was restricted to shipments from the English ports. Judge Weinfeld went on to say, "[i]t is not without signifi-

cance that the defendant offered no evidence as to the amount of the premium paid, a circumstance which the Court of Appeals suggested might have some bearing on the issue of intent." Greene v. Cheetham, 1963 A.M.C. 123, 126 (S.D. N.Y.1962), aff'd per curiam, 316 F.2d 730 (2d Cir. 1963).

In the case at bar, as in *Greene*, there is the same significant omission of the insurer to offer any evidence with respect to rate or amount of premium.

American has failed to distinguish the Greene case. The principle enunciated in *Greene* is that the purpose and intent of the assured as to point of origin coverage of specific shipments within the terms of an open policy is controlling, even though there was an erroneous description as to the point of origin in the declaration of coverage. It makes no difference in result whether the misdescription in the declaration was because of the assured's clerical error, as in *Greene*, or because of the assured's mistake of fact as to point of origin of the shipment, as in the case at bar. Under the reasoning of *Greene*, the assured is entitled to correct the erroneous misdescription so as to reflect the coverage which it reasonably intended and to which it is entitled under the terms of the open policy.

Beyond this, however, the position of the assured here is much stronger than that of the assured in *Greene*, for here the policy contemplates correction of an error in the description of the voyage[5] and apparently there was no such provision in the Greene policy.

American's additional discussion of plaintiffs' coverage from Marampa Mines to destination in New York ignores the distinction between duration of risk which is determined by the agreement of the parties and existence of an insurable interest which is determined independently of the agreement by the law of the jurisdiction. *See generally* I Arnould, The Law of Marine Insurance on Average § 306 (15th ed. Lord Chorley of Kendal & C. T. Bailhache, 1961) (Hereinafter Arnould). The oblique references in American's brief to the "dubious proposition that plaintiff had an insurable interest," passage of title, risk of loss and conflicts of laws problems, add nothing, save confusion, to the resolution of the questions before the Court.

■ · The law on insurable interest is quite clear. In Harrison v. Fortlage, 161 U.S. 57, 65, 16 S.Ct. 488, 490, 40 L.Ed. 616 (1896) it is said that "any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or lien upon, or possession of the property itself." If an assured has a contract under which the title of a cargo would accrue to him upon delivery and he would suffer from loss of the goods prior to the delivery, an insurable interest exists, Harrison v. Fortlage, supra. See also, Hagan v. Scottish Union & National Insurance Co., 186 U.S. 423, 22 S.Ct. 862, 46 L.Ed. 1229 (1902). This includes goods under an f. o. b. contract, prior to the delivery of the goods to the f. o. b. carrier. See Curacao Trading Co. v. Federal Ins. Co., 50 F.Supp. 441 (S.D.N.Y.1942), aff'd, 137 F.2d 911 (2d Cir.), cert. denied, 321 U.S. 765, 64 S.Ct. 521, 88 L.Ed. 1061 (1943). The assured need not have title to or legally enforceable in rem rights in the property insured to have an insurable interest. If any economic advantage from the continued existence or pecuniary loss from destruction or damage of the insured property results to the assured, he has an insurable interest. B. Harnett & J. V. Thornton, Insurable Interest in Property: A Socio-Economic Re-evaluation of a Legal Concept, 48 Columbia L.Rev. 1162, 1169–75 (1948). *See, e. g.*, Lucena

---

5. See generally, 4A Appleman, Insurance Law & Practice §§ 2913–2916. *See also*, Equitable Ins. Co. v. Hearne, 87 U.S. (20 Wall.) 494, 22 L.Ed. 395 (1874); Hearne v. Marine Ins. Co., 87 U.S. (20 Wall.) 488, 22 L.Ed. 395 (1874); Benward v. Automobile Ins. Co., 60 F.Supp. 995 (S.D.N.Y.1945), aff'd, per curiam, 155 F.2d 521 (2d Cir. 1946).

v. Craufurd [1805] 2 B. & P.N.R. 269, 294–298, 300–307, 314, 321–323, 127 Eng. Rep. 630, 638–645, 647–650; Le Cras v. Hughes [1782] 3 Doug. 81, 99 Eng.Rep. 549; 4 Appleman, Insurance Law and Practice, §§ 2121–2125 (1969); I Arnould §§ 6, 306–390; 3 Couch, Insurance §§ 24:1–24:13 (2d ed. 1960); I Goldin, Law of Insurance in Pennsylvania 93 (2d ed. 1946); Richardson, Law of Insurance § 87 (5th ed. 1952); Vance, Insurance §§ 29, 163–166 (3d ed. 1951); G. Salzman, The Law of Insurable Interest in Property Insurance, 522 Ins.L.J. 394 (July, 1966); Note, 71 Dick.L.Rev. 622 (1967).[6]

This is settled law which applies in all jurisdictions which have any meaningful contact with the transactions involved here, i. e., Pennsylvania, where the contract was issued,[7] Illinois, where the policy was countersigned, where the declaration and special policy were issued and where the purchase between Groban and Union appears to have been made[8]; England, where the purchase by Groban from SLDC was negotiated (but which had no contact with the Groban-Union transaction)[9]; and even New York, the forum state.[10] Thus, there are no prob-

6. "Open policies of marine insurance covering cargo not yet shipped or even contracted for, are frequent, and uniformly enforced * * *", Vance, supra § 29 at p. 177.

7. Pa.Stat.Ann. tit. 12A §§ 2–501(1) (a), (3) (1954). See Pa.Stat.Ann. tit. 12A, § 2–501, Pa. Bar Assoc. Notes; International Marine Insurance Co. v. Winsmore, 124 Pa. 61, 65–66, 16 A. 516, 517 (1889). *See also* Van Cure v. Hartford Fire Ins. Co., 435 Pa. 163, 253 A.2d 663 (1969); Heidisch v. Globe and Rep. Ins. Co., 368 Pa. 602, 84 A.2d 566 (1951); First Nat. Bank of Glen Campbell v. Burnside Nat. Bank, 314 Pa. 536, 172 A. 641 (1934); Miltenberger v. Beacom, 9 Pa. 198 (1848); Dursie v. American Union Ins. Co., 207 Pa.Super. 240, 218 A.2d 87 (1966); Farmers' and Mechanics' Mut. Ins. Co. v. Meckes, 10 Wkly. N.C. 306 (1881); Note, 71 Dick.L.Rev. 622 (1967); I Goldin, Law of Insurance in Pennsylvania 93 (2d ed. 1946).

8. E. g., Home Ins. Co. of New York v. Mendenhall, 164 Ill. 458, 45 N.E. 1078 (1897), aff'ing, 64 Ill.App. 30 (3rd Dist. 1895); Beddow v. Hicks, 303 Ill.App. 247, 25 N.E.2d 93 (1940); Welch v. Northern Assurance Co., Ltd., 223 Ill. App. 77 (1921); Agricultural Ins. Co. v. Clancey, 9 Ill.App. 137 (1881). See Ill.Ann.Stat. ch. 26, § 2–501, Illinois Code Comment (Smith-Hurd 1963); Ill. Ann.Stat. ch. 73, § 720 (Smith-Hurd 1965); Ill.Ann.Stat. ch. 121½, §§ 17–19, 22, 46 (Smith-Hurd 1960) (Repeal Effective July 1, 1962). See also Santa Rosa-Vallejo Tanning Co. v. Charles Kronauer & Co., 228 Ill.App. 236 (1923). *Cf.* Superior Household Mfg. Co. v. Brune, 339 Ill.App. 253, 89 N.E.2d 538 (1950).

9. Marine Insurance Act, 1906, ss. 5(1), (2), 7, 6 Edw. 7, c. 41; MacKenzie v.

Whitworth [1875], 1 Ex.D. 36, 44. See Sale of Goods Act, 56 & 57 Vict. c. 71 (1893), ss. 17, 18; Comptoir D-Achateet de Vente du Boerenbond Belge S. A. v. Luis de Ridder Limitada, [1949] A.C. 293, 319; Lucena v. Craufurd, [1808] 1 Taunt. 325, 127 Eng.Rep. 858. See also Arnould §§ 278, 307–311, 340, 345; P. A. Atiyah, The Sale of Goods 109, 121–122, 171–172 (3rd ed. 1966); Benjamin on Sale 320–342, 412–428, 717–718 (7th ed. A. R. Kennedy 1931); Fridman, Sale of Goods 236–242 (1966); D. Sassoon, C.I.F. and F.O.B. Contracts §§ 470–473 (1968); Carlos Federspiel & Co., S. A. v. Chas. Twigg & Co., Ltd., [1957] 1 Lloyd's List.L.R. 240; Horn v. Minister of Food, [1948] 2 All E.R. 1036; Sterns, Ltd. v. Vickers, Ltd., [1923] 1 K.B. 78, 83; The Colonial Insurance Co. of New Zealand v. The Adelaide Marine Ins. Co., [1886] 12 App. Cas. 128; Inglis v. Stock, [1885] 10 App.Cas. 263; Colley v. Overseas Exporters, [1921] 3 K.B. 302, the only English case cited by American, a fungible goods case not dealing with insurable interest, is neither controlling nor dictates a contrary finding.

10. N.Y.Ins.Law, McKinney's Consol.Laws, c. 28, § 148 (McKinney's 1966); Foley v. Manufacturers' & Builders' Fire Ins. Co., 152 N.Y. 131, 46 N.E. 318 (1897); Riggs v. Commercial Mut. Ins. Co., 125 N.Y. 7, 25 N.E. 1058 (1890); National Filtering Oil Co. v. Citizens' Ins. Co., 106 N.Y. 535, 13 N.E. 337 (1887); Rohrbach v. Germania Fire Ins. Co., 62 N.Y. 47 (1875); Fowler v. N. Y. Ind. Ins. Co., 26 N.Y. 422 (1863); Lindner v. Hartford Ins. Co., 58 Misc.2d 86, 294 N.Y.S. 2d 422 (Sup.Ct.1968), *rev'd on other grounds*, 33 A.D.2d 686, 306 N.Y.S.2d 255 (2d Dept. 1969); Insurance Co. of North America v. Seaboard Homes, Inc., 51

lems of conflicts of laws here, as American seems to imply.[11]

■ It is plain that both Groban and Union had an insurable interest in this inventory of specific and identified goods in a deliverable state from the time they left Marampa. Both the contract of purchase by Groban from SLDC and the resale by Groban to Union were made before the shipment left Marampa. Groban had both its purchase price and its resale profit in the goods at risk and Union had its purchase price and its reasonable expectation of profit from the sale of goods it had purchased from Union, whether or not they had actual title or possession. The unspelled out implication by American that these plaintiffs had no interest in the inventory at Marampa which was insurable under the terms of the policy has no support whatsoever.[12]

### C.

Plaintiffs have established that the shipment consisted of new merchandise insurable as such under the open policy against all risks of physical loss and damage; that the insurance attached and the shipment was entitled to be covered from the point of origin at Marampa to to destination in New York; that the damage occurred at Freetown during the course of transit between those two points; that they are entitled to correct the good faith error of fact in the declaration of coverage and special policy as to the point of origin and that they were therefore covered by the policy for the damage which occurred to the shipment at Freetown during transit from Marampa to New York. They are thus entitled to recover for the loss.

■ Plaintiffs and American have stipulated the amount of recovery in the event of liability on two alternate bases: (a) The damages are $42,970.89 if, as plaintiffs contend, the invoice value of $48,000 stated in the declaration and special policy is correct. That invoice value is the invoice price for the sale of the inventory to Union by Groban; (b) The damages are $18,846.90 if, as American contends, the invoice value should have been $19,231.00, the invoice price for the sale of the inventory by SLDC to Groban.

The open policy provides that shipments of new merchandise such as this

Misc.2d 486, 273 N.Y.S.2d 470 (Sup.Ct. 1965) ; Friscia v. Safeguard Ins. Co., 57 Misc.2d 759, 293 N.Y.S.2d 695 (Civ. Ct.City of N.Y.1968) ; Feinman v. Consolidated Mut. Ins. Co., 155 N.Y.S.2d 326 (N.Y.City Mun.Ct.1956) ; Modern Music Shop v. Concordia Fire Ins. Co., 131 Misc. 305, 226 N.Y.S. 630 (N.Y.City Mun.Ct. 1927). Plata American Trading, Inc. v. Lancashire, 29 Misc.2d 246, 214 N.Y.S.2d 43, also cited by American, also a fungible goods case, is at variance with the then existing New York law, and dealt with attachment of risk not insurable interest. See N.Y.Pers.Prop.Law §§ 98, 99, 100 (Rule 1), 103 (McKinney's Consol.Laws, c. 41, 1962), and cases above. New York law on the existence of an insurable interest in goods is now controlled by N.Y. U.C.C. § 2–501 (McKinney's 1964).

11. None of the parties advert to the somewhat obscure question whether insurable interest under the open policy, obviously a marine contract, Insurance. Company v. Dunham, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870) ; see The Lottawanna, 88 U.S. (21 Wall.) 558, 22 L.Ed. 654 (1874), is to be determined under the general maritime law or by state law. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) ; Kossick v. United Fruit Co., 365 U.S. 731, 742, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Since there is no conflict between the general maritime law and the law of any jurisdiction possibly involved, this question need not be discussed. In re M/T ALVA CAPE, 405 F.2d 962 (2d Cir. 1969). Moreover, there has been no suggestion that the applicable law is that of Sierra Leone where the goods were located when purchased by Groban and where the loss occurred and no reference to what that law is.

12. American's further contention that Union acquired no rights under the policy and is not entitled to sue thereon because of arrangements Union made with Groban subsequent to the arrival of the goods in New York and discovery of the damage, is so devoid of merit as not to require discussion. In any event, Groban and Union have stipulated as between themselves that if either plaintiff is entitled to judgment, judgment may be awarded in their joint favor.

are "valued, premium included at invoice value" plus 10%. The declaration and certificate both provided that the shipment was "insured for Fifty-two thousand, eight hundred dollars, valued at sum insured $48,000 plus 10%." As has been indicated, $48,000 was the invoice price of Groban's sale of the inventory to Union.

Under the open policy, Groban was entitled to insure not only for its own account but "for the account of others from whom written instructions to insure have been received prior to any known or reported loss, damage or accident and prior to sailing of vessel." Instructions to insure the goods for full value were received by Groban from Union shortly after the Union purchase order for $48,000 was issued and while the goods were still at Marampa. Plainly, Union, which could not have been aware of the figure at which Groban had purchased the inventory, was concerned with protecting the goods at the amount it was paying Groban for them and that was the invoice price (or value) of $48,000. Groban, in turn, was concerned with protecting the purchase price of $48,000 which it expected to receive from Union on resale, which was obviously the value of the goods to Groban at that time. Both plaintiffs acted in reasonable reliance upon the goods being so insured.

The term "invoice value" is nowhere defined or limited in any way in the open policy. American has shown nothing to indicate that any such limitation as it suggests could be reasonably imposed. As stated in Anchor Line v. Jackson, 9 F.2d 543, 545 (2d Cir. 1925), "[t]he phrase 'invoice value' means the amounts written into the invoices taken as of the time of shipment and it means nothing more." The value and, indeed, the invoice value

of these goods to both of the assureds at the time of shipment was the $48,000 figure. This is "consistent with the apparent object and plain intent of the parties," see Hoffman v. Illinois National Casualty Co., 159 F.2d 564 (7th Cir. 1947), and must be given effect. Cf. I Arnould, § 302.

American has shown no reason why it should be permitted to take advantage of the fact that Groban had made a fortuitous purchase of the inventory at a price far below what was the value of the shipment to both plaintiffs when the shipment was made. It may be noted, in addition, that $48,000 was a wholesale price and did not cover such profit as Union could reasonably have expected from the sale of the parts at retail. Moreover, any premium charged by American would have certainly been based on the $48,000 figure stated in the declaration and special policy and not on the $19,231.00 figure for which Groban had purchased the goods from SLDC.

I hold that the goods were properly insured at the invoice value of $48,000 and that American is liable under its policy for stipulated damages of $42,970.89 on that basis.

Plaintiffs also seek interest on this amount at the rate of 5% per annum allowable under Illinois law from January 3, 1961 and are entitled thereto.

Judgment will be entered in favor of plaintiffs Union and Groban against defendant American in the sum of $42,970.89 with interest thereon at the rate of 5% per annum from January 3, 1961 to the date of entry of judgment, together with costs.

The foregoing opinion constitutes my findings of fact and conclusions of law in these cases.

It is so ordered.